**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 20, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 05-3169

CARL A. PATTON,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 04-10170-01)**

Timothy J. Henry, Federal Public Defender Office, Wichita, Kansas for
Defendant-Appellant.

Brent I. Anderson, Assistant United States Attorney, (Eric F. Melgren, United
States Attorney, with him on the brief) Office of the United States Attorney,
Wichita, Kansas, for Plaintiff-Appellee.

Before **McCONNELL** and **BALDOCK**, Circuit Judges, and **ARMIJO**, District
Judge.[*]

**McCONNELL**, Circuit Judge.

---

[*]The Honorable M. Christina Armijo, United States District Court, District
of New Mexico, sitting by designation.

It may seem like common sense to prohibit felons' possession of bulletproof vests and other forms of body armor, which facilitate violent crime. Indeed, thirty-one states already do so. But the Constitution does not grant the federal government a police power or a general authority to combat violent crime. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 426 (1821) (Marshall, C.J.) ("Congress has . . . no general right to punish murder committed within any of the States."). The myriad provisions in the federal criminal code are justified, as a constitutional matter, only by reference to Congress's enumerated powers. We are required in this case to determine whether Congress has authority under its power "[t]o regulate Commerce . . . among the Several states," U.S. Const. art. I, § 8, cl. 3, to prohibit the intrastate possession by a felon of a bulletproof vest, in the absence of any commercial transaction or any evidence of a connection to commercial activity other than the fact that, before it was lawfully purchased by the defendant, the vest had been sold across a state line.

Deciding this question requires us to choose between following an older precedent of the Supreme Court and applying the Court's current three-part test for determining the reach of the Commerce Clause. We follow the older precedent directly on point, conclude that Congress does have this authority, and **AFFIRM** the conviction.

## I. Factual and Procedural Background

Defendant-Appellant Carl Patton was once a member of the Junior Boys gang in northeast Wichita, Kansas. He has two prior state-court felony convictions for gang-related violence. In 1990 he pleaded guilty to attempted aggravated battery in the shooting of a member of a rival gang, the Crips, and in 1994 he was convicted of aggravated assault, discharge of a firearm at an occupied building, and criminal possession of a firearm, all of which stemmed from an altercation with two members of another competing gang, the Bloods.

In October 2001, after serving his sentence for the second felony, Mr. Patton was paroled to his grandparents' house in his old neighborhood in Wichita. According to his story,[1] Mr. Patton wanted to be paroled to Connecticut, where his then-girlfriend lived and where he would be far removed from the gang activity with which he had formerly been associated. He was required to return to northeast Wichita, however, because under parole rules he could be paroled only to live with a family member or a spouse. That placed him in continual danger. Even though (according to his story) Mr. Patton had learned his lesson and abandoned his life of gang violence, his former associates and rival gang members still had scores to settle. In late 2001, for example, two members of the

---

[1]For purposes of adjudicating the issues in this case, the district court accepted and the government does not contest Mr. Patton's account of the factual background.

Bloods (one armed) approached him at a gas station. Mr. Patton escaped unharmed. In May 2002, members of the Bloods carried out a drive-by shooting on the 2300 block of North Kansas Street in Wichita, firing at Mr. Patton and others who were in the building. Because of the danger to his life, Mr. Patton has refused to allow his children or his grandparents to ride in the same car with him.

In the fall of 2001, after his encounter with the armed gang member at the gas station, Mr. Patton purchased a bulletproof vest that had been manufactured in California. At that time, both his purchase and his possession of the vest were lawful under federal and state law. According to Mr. Patton, during his parole he was not a gang member and wore the vest solely to protect himself.

On November 21, 2003, officers from the Wichita Police Department investigated a domestic disturbance call involving Mr. Patton. When the officers arrived, they found no weapons in Mr. Patton's possession but did discover that he was wearing a bulletproof vest. On July 29, 2004, Mr. Patton was charged with being a felon in possession of body armor, in violation of a recently enacted statute, 18 U.S.C. § 931. On October 14, 2004, Mr. Patton moved to dismiss the indictment on the grounds that it violated the Commerce and Due Process Clauses of the federal Constitution. The district court denied the motion on November 16. The next day, a superseding indictment added charges that Mr. Patton had possessed the body armor "in and affecting commerce" and that the body armor

was a bulletproof vest "that was not produced in the State of Kansas and was sold or offered for sale in interstate or foreign commerce." R. Vol. I, Doc. 19.

Mr. Patton also raised the defense of necessity. On January 19, 2005, after a hearing, the district court found that Mr. Patton had failed to meet the requirements for a necessity defense. Within a week, Mr. Patton entered a conditional guilty plea, preserving his right to appeal both the denial of his motion to dismiss the indictment and the grant of the government's motion in limine to exclude a necessity defense. On April 6, 2005, Mr. Patton was sentenced to eighteen months in federal prison and one year of supervised release. He now appeals the issues preserved in the conditional plea.

## II. The Commerce Clause

Mr. Patton argues first that he was convicted under a statute that exceeds Congress's power under the Commerce Clause. We review the constitutionality of the statute *de novo*. *United States v. Jeronimo-Bautista*, 425 F.3d 1266, 1268-69 (10th Cir. 2005). The statute is 18 U.S.C. § 931, which makes it a crime "for a person to purchase, own, or possess body armor, if that person has been convicted of a felony" that qualifies as a crime of violence under 18 U.S.C. § 16. 18 U.S.C. § 931(a). "Body armor" is defined as "any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to

protect against gunfire." *Id.* § 921(a)(35).[2] We stress that Mr. Patton was convicted of mere *possession* of the body armor—not purchase, not sale, not commercial use. This possession occurred entirely within the borders of the State of Kansas. The statute makes no reference to any effect Mr. Patton's possession or use of the bulletproof vest might have had on interstate commerce. The only connection between his possession and interstate commerce is the fact that, prior to his purchase, the bulletproof vest was manufactured in another state and moved across state lines. Moreover, at the time Mr. Patton acquired the vest in 2001, Congress had not yet made the purchase or possession of body armor by felons a federal crime. *See* James Guelff and Chris McCurley Body Armor Act of 2002, § 11009(e)(2)(A), Pub. L. No. 107-273, Div. C, 116 Stat. 1819, 1821 (codified at 18 U.S.C. § 931) (criminalizing the possession of body armor by felons as of Nov. 2, 2002). It may also be significant that during the incident for which Mr. Patton was prosecuted, he was not armed; for all that appears, he was wearing the bulletproof vest solely in self-defense against attacks motivated by his former association with the Junior Boys gang.

---

[2]We surmise that Mr. Patton is bringing both a facial challenge to the statute to the extent it forbids possession and an as-applied challenge to a ban on Mr. Patton's "[s]imple possession of a bullet-proof vest that has come to rest in Kansas, and which has long since left the channels of commerce." Br. for Appellant 13. Mr. Patton does not challenge the statute as it applies to purchases.

The Supreme Court has articulated "three general categories of regulation in which Congress is authorized to engage under its commerce power." *Gonzales v. Raich*, 545 U.S. 1, 125 S. Ct. 2195, 2205 (2005). These are "the channels of interstate commerce"; "the instrumentalities of interstate commerce, and persons or things in interstate commerce"; and "activities that substantially affect interstate commerce." *Id.*; *see also United States v. Lopez*, 514 U.S. 549, 558 (1995); *Perez v. United States*, 402 U.S. 146, 150 (1971). We conclude that the statute prohibiting possession of body armor by a felon does not fit within any of the three categories, but we uphold it under the authority of other precedents from the Supreme Court and from this Court.

## A. Channels of Interstate Commerce

First, Congress may regulate the "channels of interstate commerce." *Lopez*, 514 U.S. at 558; *Raich*, 125 S. Ct. at 2205. Under this category, Congress regulates not conduct *related to* interstate commerce but rather interstate commerce itself—barring from the channels of interstate commerce a class of goods or people. *See United States v. Rybar*, 103 F.3d 273, 288-89 (3d Cir. 1996) (Alito, J., dissenting) (describing the first category as concerning "Congress's power to regulate, for economic or social purposes, the passage in interstate commerce of either people or goods"). For example, Congress may ban the interstate shipment of stolen goods or kidnapped persons, *Perez*, 402 U.S. at 150; the interstate shipment of goods produced without minimum-wage and maximum-

hour protections, *United States v. Darby*, 312 U.S. 100, 112-14 (1941); the interstate transportation of a woman or girl for prostitution, *Caminetti v. United States*, 242 U.S. 470, 491-92 (1917); or the interstate mailing or transportation of lottery tickets, *Lottery Case*, 188 U.S. 321, 354-55 (1903).  As the illustrative cases show, Congress's authority is not confined to regulations with a narrowly economic purpose or impact.  Congress "is free to exclude from the commerce articles whose use in the states for which they are destined it may conceive to be injurious to the public health, morals or welfare." *Darby*, 312 U.S. at 114; *see also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964) (stating that the Commerce Clause allows "'Congress to keep the channels of interstate commerce free from immoral and injurious uses'" (quoting *Caminetti*, 242 U.S. at 491)).  But this category is confined to statutes that regulate interstate transportation itself, not manufacture before shipment or use after shipment.[3]

The statute in this case cannot fit within the first category because it is not directed at the movement of body armor through the channels of interstate commerce.  Section 931 prohibits the stationary and entirely intrastate act of possession of body armor.  It would be different if the defendant had been

---

[3]*Caminetti* is no exception.  Although the statute upheld in that case does focus on the purpose of the transportation—prostitution—this must be the purpose at the time of transportation; the statute does not criminalize the transportation of persons who happen, after crossing state lines, to become prostitutes. *See Caminetti*, 242 U.S. at 488 n.1.

convicted under a statute forbidding the interstate transportation of body armor, or perhaps interstate transportation by a felon or for the purpose of sale to a felon. The statute under which he was convicted, however, goes beyond the scope of the first category. A prohibition on the mere intrastate possession of body armor cannot be upheld under Congress's power to regulate the channels of interstate commerce.

## B. Instrumentalities of Interstate Commerce

Under the second category, Congress may regulate and protect "the instrumentalities of interstate commerce, or persons or things in interstate commerce." *Lopez*, 514 U.S. at 558; *see also Raich*, 125 S. Ct. at 2205. The "instrumentalities" are the means of interstate commerce, such as ships and railroads, and the "persons or things in interstate commerce" are the persons or things transported by the instrumentalities among the states. *See, e.g.*, *Lopez*, 514 U.S. at 558; *Perez*, 402 U.S. at 150. In *Pensacola Tel. Co. v. W. Union Tel. Co.*, 96 U.S. (6 Otto) 1, 9 (1877), the Supreme Court noted that the "instrumentalities of commerce," which then included the steamboat, the railroad, and the telegraph, are not fixed but "keep pace with the progress of the country."

Regulation under this category may extend to intrastate activities that threaten these instrumentalities. For example, Congress may prevent the intrastate destruction of aircraft. *Perez*, 402 U.S. at 150. In the *Shreveport Rate Cases*, 234 U.S. 342, 351-353 (1914), the Court explained that Congress has

authority to "prevent the common instrumentalities of interstate and intrastate commercial intercourse from being used in their intrastate operations to the injury of interstate commerce." *See also Southern Ry. Co. v. United States*, 222 U.S. 20, 26 (1911) (upholding congressional power over intrastate commerce where the regulation has a "real or substantial relation or connection" to "the safety of interstate commerce and of those who are employed in its movement"). Congress may also protect the persons or things that the instrumentalities are moving. Thus, the Supreme Court has sustained a federal statute prohibiting the theft of goods from shipwrecked vessels. *United States v. Coombs*, 37 U.S. (12 Pet.) 72, 78 (1838). The illustrative cases for this category involve things actually being moved in interstate commerce, not all people and things that have ever moved across state lines. *See, e.g.*, *Perez*, 402 U.S. at 150 (illustrating regulation of "persons or things in commerce" with a statute prohibiting "thefts from interstate shipments"); *see also Lopez*, 514 U.S. at 559 (rejecting the idea that the prohibition on possessing firearms near schools could "be justified as a regulation by which Congress has sought to protect . . . a thing in interstate commerce"); *Gibbs v. Babbitt*, 214 F.3d 483, 491 (4th Cir. 2000) (rejecting the notion that past movement across state lines could mark something forever as "a 'thing' in interstate commerce" and noting that category two did not apply in *Lopez* "despite the fact that the regulated guns likely traveled through interstate commerce").

The statute in this case does not fall within the second category. Body armor itself is not an instrumentality, or means, of interstate commerce, and the statute does not protect body armor while it is moving in interstate shipment. Nor is the statute directed at the use of body armor in ways that threaten or injure the instrumentalities of interstate commerce. The statute prohibits the bare possession of body armor by a felon, wherever it occurs, and without regard to its use or effect. Accordingly, it exceeds congressional authority to protect the instrumentalities of, and persons or things in, interstate commerce.

### C. Activities Substantially Affecting Interstate Commerce

Under the third category, Congress may regulate "activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59; *Raich*, 125 S. Ct. at 2205. This is the most unsettled, and most frequently disputed, of the categories. Under the first two categories Congress may regulate or protect actual interstate commerce; the third allows Congress to regulate intrastate noncommercial activity, based on its effects.

Consideration of effects necessarily involves matters of degree. The third category thus poses not two hazards, like Scylla and Charybdis, but three. If we entertain too expansive an understanding of effects, the Constitution's enumeration of powers becomes meaningless and federal power becomes effectively limitless. If we entertain too narrow an understanding, Congress is stripped of its enumerated power, reinforced by the Necessary and Proper Clause,

-11-

to protect and control commerce among the several states.  If we employ too nebulous a standard, we exacerbate the risk that judges will substitute their own subjective or political calculus for that of the elected representatives of the people, or will appear to be doing so.

The Supreme Court's decisions in *Lopez*, *United States v. Morrison*, 529 U.S. 598, 609 (2000), and *Raich* all hinged on interpretation of the third category. Under this category we have upheld statutes that prohibit the production of child pornography and the possession of machine guns.  *Jeronimo-Bautista*, 425 F.3d 1266  (upholding 18 U.S.C. § 2251(a), which prohibits the production of child pornography with materials that moved in interstate commerce); *United States v. Wilks*, 58 F.3d 1518, 1521-22 (10th Cir. 1995) (upholding 18 U.S.C. § 922(o), which prohibits the possession of machine guns).[4]  The question in such cases is

_____

[4]Although in *Wilks* we did describe machine guns as "things in interstate commerce," we effectively analyzed the statute using the tools of the third category, such as considering the national market, aggregating the effects on interstate commerce, and considering the broader regulatory scheme.  *Wilks*, 58 F.3d at 1521-22.  After *Raich* this case unmistakably falls within the third category.  *Compare id.* (drawing an analogy to the need to regulate "intrastate narcotics to effectively regulate the interstate trafficking in narcotics," contrasting activities that "could not substantially affect commerce" even when aggregated, noting congressional regulation of "this extensive, intricate, and definitively *national* market for machineguns," and relying on legislative history that describes the broader regulatory scheme (internal quotation marks omitted)), *with Raich*, 125 S. Ct. at 2203-04, 2209-10 (describing in detail Congress's "closed regulatory system" of controlled substances and distinguishing *Lopez* because the prohibition on possession of marijuana was necessary to "a larger regulation of economic activity" (internal quotation marks omitted)).  In *United States v.*

(continued...)

whether Congress had a rational basis to find that the regulated activity, taken in the aggregate, would substantially affect interstate commerce. *Raich*, 125 S. Ct. at 2208. To answer that question, we consider "whether (1) the activity at which the statute is directed is commercial or economic in nature; (2) the statute contains an express jurisdictional element involving interstate activity that might limit its reach; (3) Congress has made specific findings regarding the effects of the prohibited activity on interstate commerce; and (4) the link between the prohibited conduct and a substantial effect on interstate commerce is attenuated." *United States v. Grimmett*, 439 F.3d 1263, 1272 (10th Cir. 2006) (facial challenge); *see also Jeronimo-Bautista*, 425 F.3d at 1269 (as-applied challenge). The first factor determines whether the regulated activity falls within the definition of "commerce." If so, in light of the substantial integration of the American economy in the past two centuries, there is a heavy—perhaps in reality irrebuttable—presumption that it affects more states than one, and falls within congressional power. *See Lopez*, 514 U.S. at 574 (Kennedy, J., concurring)

---

[4](...continued)
*Haney*, 264 F.3d 1161, 1163 (10th Cir. 2001), we upheld the federal ban on machine gun possession, 18 U.S.C. § 922(o), under the second and third categories. We found the Commerce Clause challenge "foreclosed by controlling Tenth Circuit precedent" on precisely the same statute, namely *Wilks*, and we held "that banning possession of post 1986 machineguns is an essential part of the federal scheme to regulate interstate commerce in dangerous weapons." *Haney*, 264 F.3d at 1163, 1168-1171. Like *Wilks*, our decision in *Haney* anticipated and falls squarely within the Supreme Court's analysis of the third category in *Raich*.

("Congress can regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy."). Where the regulated activity is noncommercial, the last three factors are significant. They look to three different sources of evidence regarding whether there is a substantial effect on interstate commerce: the statutory text, the articulated congressional understanding, and independent evidence of whether the activity has a substantial effect in the aggregate. We will discuss each of these factors, but not in the above-listed order.

### 1. *Is the regulated activity commercial?*

We first consider "whether the prohibited activity is commercial or economic." *Jeronimo-Bautista*, 425 F.3d at 1269. The Constitution gives Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The distinction between what is and is not commercial therefore lies at the heart of the Commerce Clause. Of course, like many constitutional terms, the meaning of "commerce" is neither obvious nor uncontested. The Supreme Court has warned against a definition under which "any activity can be looked upon as commercial," since this would obliterate the intended limits on federal power. *Lopez*, 514 U.S. at 565. The best historical scholarship indicates that in addition to its primary sense of buying, selling, and transporting merchandise, the term "commerce" was understood at the Founding to include the compensated provision of services as well as activities in

-14-

preparation for selling property or services in the marketplace, such as the production of goods for sale.  *See* Grant S. Nelson & Robert J. Pushaw, Jr., *Rethinking the Commerce Clause: Applying First Principles to Uphold Federal Commercial Regulations but Preserve State Control over Social Issues*, 85 Iowa L. Rev. 1, 9-42, 107-110 (1999) (citing, among other sources, Daniel Defoe, *A Plan of the English Commerce* (2d ed. 1730), Adam Smith, *An Inquiry Into the Nature and Causes of the Wealth of Nations* (1776), *The Federalist No. 11* (Alexander Hamilton) (Jacob E. Cooke ed., 1961), and 2 *Records of the Federal Convention* 449-50 (Max Farrand ed., 1911) (statement of Charles Pinckney)).[5] In *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 189-90 (1824), Chief Justice Marshall referred to commerce as "a general term, applicable to many objects . . . . Commerce, undoubtedly, is traffic, but it is something more . . . . It describes the commercial intercourse between nations, and parts of nations, in all its branches." In the usage of the time, "the 'branches' of 'commercial intercourse' referred to activities integrally related to trade, such as transportation, production, labor, banking, and insurance."  Robert J. Pushaw, Jr., *The Medical Marijuana Case: A Commerce Clause Counter-Revolution?*, 9 Lewis & Clark L. Rev. 879, 887 (2005).

---

[5]Justice Thomas has espoused a narrower historical definition, confining the term to its primary sense of buying and selling goods and excluding preparatory activities.  *See Lopez*, 514 U.S. at 585-87 (Thomas, J., concurring).

In *Lopez*, the Court held that possession of firearms, in itself, is not commercial or economic. 514 U.S. at 560 (concluding that the prohibition on firearm possession near a school "by its terms has nothing to do with 'commerce' or any sort of economic enterprise"). That makes sense, because the mere possession of a firearm does not constitute the buying, selling, production, or transportation of products or services, or any activity preparatory to it. *See United States v. Price*, 265 F.3d 1097, 1107 (10th Cir. 2001) (contrasting the statutes in *Lopez* and *Morrison*, "which criminalized non-economic behavior," with 21 U.S.C. § 841(a)(1), which makes it illegal to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance"—activities that are "economic in character"). The *Lopez* Court's conclusion on this point was restated and reaffirmed in *Raich*, 125 S. Ct. at 2211, and we therefore regard it as settled. The same conclusion must follow for the possession of body armor. We can think of no reason that mere possession of body armor by a felon would be deemed commercial when the mere possession of a firearm near a school was not.

We recognize that in *Raich*, the Court interpreted the contours of the third category by reference to "economics" rather than "commerce," and included the "consumption of commodities" as well as their production and distribution within that definition. *Id.* (internal quotation marks omitted). That does not alter our conclusion. First, we are bound by the holding of *Lopez*, reaffirmed in *Raich*,

that the mere possession of firearms near a school is not a commercial activity for purposes of the third category. Second, possession of firearms or body armor cannot be described as "consumption." Consumption is the "act of destroying a thing by using it; the use of a thing in a way that thereby exhausts it," *Black's Law Dictionary* 336 (8th ed. 2004), and possessing or wearing body armor neither destroys nor exhausts it. Finally, we note that the *Raich* opinion as a whole treats congressional authority over the domestic consumption of marijuana as within the third category only because it was connected to a comprehensive national ban on "the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market." *Raich*, 125 S. Ct. at 2211. The Controlled Substances Act, the statute at issue in *Raich*, prohibited possession of marijuana as a "means of regulating commerce in that product." *Id.* We do not interpret *Raich* as holding that Congress may criminalize the mere possession of a commodity for the purpose of consumption, divorced from such a comprehensive regulatory scheme, based on the third category.

Our conclusion that the possession of body armor is not a commercial activity does not end the inquiry, but it does channel our analysis. Where the regulated activity is commercial in nature, it generally (perhaps invariably) follows that, aggregated with similar activities elsewhere, the activity affects the national economy sufficiently to fall within congressional power. *See, e.g.*, *United States v. Sullivan*, 332 U.S. 689, 698 (1948) (upholding application of the

misbranding provision of the Federal Food, Drug, and Cosmetic Act to local sales of drugs); *Perez*, 402 U.S. at 156-57 (upholding federal law against loan sharking). But where the regulated activity is not commercial in nature, Congress may regulate it only where there are "substantial" and not "attenuated" effects on other states, on the national economy, or on the ability of Congress to regulate interstate commerce. *Morrison*, 529 U.S. at 614-16. In considering that question, we give special deference to any findings Congress may have made regarding the connection of the statute to interstate commerce, and we assess the effect of any jurisdictional hook that may confine application of the statute to situations affecting interstate commerce. We ask not whether, as judges, we believe the challenged statute has a substantial effect on interstate commerce, but whether Congress could reasonably have thought so.

2. *What is the relation of the regulated activity to interstate commerce?*

Where possession of an item is not a commercial activity in itself, it may nonetheless have a substantial and non-attenuated effect on interstate commerce in two ways. First, possession of a good is related to the market for that good, and Congress may regulate possession as a necessary and proper means of controlling its supply or demand. For example, the federal government may elect to prohibit the possession of eagle feathers as a practical means of drying up the market for them, and thus protecting against the killing of eagles. *Andrus v. Allard*, 444 U.S. 51, 58 (1979). Second, possession of a good is related to the use

-18-

of that good, and its use may have effects on interstate commerce. For example, no one would doubt Congress's authority to prohibit the civilian possession of surface-to-air missile launchers, on the theory that their only possible use would substantially affect interstate commerce. We will examine both possibilities, in light of Supreme Court precedents in analogous cases.

         ***a.       Regulation of possession as a means of regulating the interstate market for body armor***

In *Raich*, 125 S. Ct. at 2211, and earlier in *Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942), the Supreme Court upheld the authority of Congress to prohibit the domestic consumption of a home-grown commodity, where that prohibition was an indirect and supplemental, but still essential, means of enforcing regulations on the national market in that commodity. In *Raich*, the Court concluded that noncommercial possession of home-grown marijuana for personal medical use, as authorized by state law, could rationally be considered an inseparable part of the broader, and undeniably commercial, national market for marijuana. 125 S. Ct. at 2211. Under the Controlled Substances Act, the manufacture, distribution, possession, and use of marijuana are illegal. *Id*. Because of the difficulty of distinguishing home-grown marijuana consumed for medical reasons from other marijuana, and the constant possibility of its diversion into illicit channels, the Court concluded that Congress could rationally believe that medical marijuana, if exempted from the Act, would significantly increase

-19-

the supply of marijuana and that some of this marijuana would move in interstate commerce. *Id*. at 2213-14. The Court distinguished *Lopez* and *Morrison* on the ground that the challenged provisions in those cases were not part of a comprehensive regulation of economic activity. *Id*. at 2209-11.

In the statute at issue in *Wickard*, Congress enacted a comprehensive program limiting the production of certain agricultural commodities for the purpose of raising their market price. 317 U.S. at 125-27. The Court upheld application of those regulations to wheat produced by a farmer for his own family's domestic and livestock consumption, on the theory that allowing farmers to evade the production restrictions, when consuming wheat for their own use, would undermine the economic objectives of the entire program. *Id*. at 127-28.

In both *Raich* and *Wickard*, the regulation of domestic possession and use was justified on the basis of its impact on a comprehensive regulatory scheme directed at interstate production, distribution, and sale. By contrast, in *Lopez*, where there was no such connection to a comprehensive regulation of the national market, the Court made clear that Congress could not reach mere possession under the Commerce Clause. 514 U.S. at 560 ("Section 922(g) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity were regulated.").

This Court has used the same rationale to sustain congressional prohibitions on the production and possession of child pornography. In *Jeronimo-Bautista* and

*Grimmett*, this Court held that Congress has authority under the Commerce Clause to prohibit mere possession of child pornography, on the rationale that prohibiting possession was an essential part of a comprehensive scheme to destroy the market for this pernicious commodity. *Grimmett*, 439 F.3d at 1272; *Jeronimo-Bautista*, 425 F.3d at 1271. Thus, although possession of child pornography might in some cases be intrastate and noncommercial, prohibiting it across the board can be an indirect and supplemental, but still essential, means of controlling the interstate commercial market. *Accord United States v. Maxwell*, — F.3d —, No. 03-14326, 2006 WL 1041011, at *5 (11th Cir. Apr. 20, 2006) ("[W]here Congress comprehensively regulates economic activity, it may constitutionally regulate intrastate activity, whether economic or not, so long as the inability to do so would undermine Congress's ability to implement effectively the overlying economic regulatory scheme.").

Where the statute is not part of a comprehensive scheme of regulation, however, the Court has not upheld federal regulation of purely intrastate noneconomic activity. *See Morrison*, 529 U.S. at 610 (indicating that the "noneconomic, criminal nature of the conduct at issue" in *Lopez* "was central to [the] decision"); *id.* at 613 (noting that the Supreme Court had "upheld Commerce Clause regulation of intrastate activity only where that activity [was] economic in nature"); *Raich*, 125 S. Ct. at 2210 (noting that in *Morrison* the Court "held the statute unconstitutional because, like the statute in *Lopez*, it did not regulate

-21-

economic activity"); *id.* at 2211 (upholding "a statute that directly regulates economic, commercial activity").

We must therefore determine whether the prohibition on possession of body armor by felons is an essential part of "comprehensive legislation to regulate the interstate market in a fungible commodity." *Raich*, 125 S. Ct. at 2209. It is not. In contrast to its comprehensive ban on marijuana under the Controlled Substances Act, Congress has not prohibited the manufacture, distribution, sale, possession, or use of body armor. Members of the U.S. military, federal agents of the CIA and FBI, local police officers, security guards, hunters, convenience store owners—all non-felons—are free to buy, own, and possess body armor. Companies are free to produce and sell it. The prohibition of possession by a small class of persons, felons, is unrelated to any broader attempt to suppress the market (as in *Raich*, *Jeronimo-Bautista*, or *Grimmett*) or to comprehensively control supply (as in *Wickard*). Even with respect to felons, the statute's non-commercial focus is clear from what goes unpunished. No one violates the law by selling to a felon or buying from a felon, and felons themselves may sell body armor previously acquired or use it in the course of their licit occupations. 18 U.S.C. § 931(b)(1).

Moreover, in this case, Mr. Patton acquired his bulletproof vest at a time when possession of body armor by felons was lawful. Here, therefore, there is no logical connection—not even an attenuated one—between his possession and the

-22-

body armor market. Since it was lawful for him to purchase and possess the armor when he bought it, prohibition of continued possession cannot contribute, even indirectly, to regulating the market. *Cf. United States v. Marrero*, 299 F.3d 653, 655-56 (7th Cir. 2002) ("[W]e are in a new era and must be wary of such arguments as that the theft of a bottle of aspirin from a person's home 'affects' commerce, provided only that the bottle was shipped from another state, because the homeowner would be likely to buy another bottle from his local druggist to replace the one that was stolen and the druggist would replace that sale by purchasing another bottle interstate.").

Nor does it matter that body armor is subject to pervasive regulation by the states, as discussed below. Such regulation of a commodity is not enough to establish a comprehensive regulatory scheme, because this was surely present in *Lopez* and the states and the federal government regulate firearms more extensively than body armor. *See* Anthony A. Braga et al., *The Illegal Supply of Firearms*, 29 Crime & Just. 319, 321-24 (2002) (describing the extensive regulation of firearms). Like the statute in *Lopez*, section 931 regulates possession for its own sake and cannot be justified as part (much less as an essential part) of a comprehensive regulation of the market in body armor.

**b.** *Regulation of possession as a means of controlling uses that might affect interstate commerce*

The second way in which noncommercial, intrastate possession of an item might substantially affect interstate commerce is related to use. Possession might be prohibited as an anticipatory means of prohibiting use of a thing in a way that affects interstate commerce.

Actually, any use of anything might have an effect on interstate commerce, in the same sense in which a butterfly flapping its wings in China might bring about a change of weather in New York. Thomas Jefferson warned against an overly expansive notion of cause and effect in interpreting the combination of Congress's enumerated powers and the Necessary and Proper Clause:

> Congress are authorized to defend the nation. Ships are necessary for defense; copper is necessary for ships; mines necessary for copper; a company necessary to work mines; and who can doubt this reasoning who has ever played at "This is the House that Jack Built?"

Letter from Thomas Jefferson to Edward Livingston (Apr. 30, 1800), *in* 10 *The Writings of Thomas Jefferson* 165 (Albert Ellery Bergh ed., 1903). *See also United States v. A.L.A. Schechter Poultry Corp.*, 76 F.2d 617, 624 (2d Cir. 1935) (L. Hand, J., concurring) ("In an industrial society bound together by means of transport and communication as rapid and certain as ours, it is idle to seek for any transaction, however apparently isolated, which may not have an effect elsewhere; such a society is an elastic medium which transmits all tremors throughout its territory; the only question is of their size."), *aff'd in part and rev'd in part*, 295

U.S. 495 (1935). If any activity with any effect on interstate commerce, however attenuated, were within congressional regulatory authority, the Constitution's enumeration of powers would have been in vain.

That is why the Supreme Court has insisted that, to justify congressional exertion of the commerce power within the third category, the effects must be both "significant" and not "attenuated." *See, e.g.*, *Morrison*, 529 U.S. at 612-15. The clearest examples are the Court's decisions in *Lopez* and *Morrison*, which were reaffirmed in *Raich*. Dissenters in those cases offered powerful arguments that the regulated activities—possession of firearms near schools and gender-motivated violence—could and did have significant effects on economic activity. In both cases the majority rejected those arguments, largely on the ground that, if accepted, similar effects could be invoked in every case, and the Commerce Clause would become, in effect, a grant of general governing authority. *See Lopez*, 514 U.S. at 564 (disfavoring the government's expansive understanding of the Commerce Clause because it would leave the Court "hard pressed to posit any activity by an individual that Congress [would be] without power to regulate"); *Morrison*, 529 U.S. at 615 ("If accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption.").

No one would question that the possession of body armor by felons contributes to crime, or that crime has a measurable and significant impact on the national economy. But that was the argument rejected in *Lopez* and *Morrison*. Possession of firearms in the vicinity of schools can contribute to crime, and gender-motivated violence *is* crime. This Court, being bound by the precedents of *Lopez* and *Morrison*, therefore cannot hold that simply because body armor facilitates crime, the subject falls within Congress's commerce power.

Indeed, application of section 931 in this case has an even more attenuated relation to interstate commerce than the possession of firearms in *Lopez*—let alone the actual commission of violent offenses in *Morrison*. Unlike carrying a firearm in the vicinity of a school, wearing body armor is not an inherently threatening act. Much of the time, wearing body armor is an act of self-defense, which reduces rather than increases crime. This case illustrates the point: Mr. Patton was not armed at the time he was apprehended and—according to his story—was wearing the vest solely because his prior gang activity, now abandoned, made him vulnerable to attack. If the statute were limited to possession of body armor in conjunction with an offensive weapon, or to the use of body armor in the commission of a crime affecting interstate commerce, which were the scenarios motivating its enactment,[6] the connection would be less

---

[6]Congress enacted the statute in response to three notorious incidents in
(continued...)

attenuated. As it is, however, application of section 931 to the circumstances of this case cannot be reconciled with *Lopez* and *Morrison*.

Moreover, the dissenters' arguments in *Lopez* and *Morrison* regarding the substantial effect of the regulated conduct on interstate commerce largely rested on the frequent incidence, and therefore significant aggregated effect, of the conduct. *See e.g.*, *Lopez*, 514 U.S. at 616, 619-27 (Breyer, J., dissenting); *Morrison*, 529 U.S. at 659-60 (Breyer, J., dissenting). The theory was that widespread conduct, occurring nationwide, has national consequences and warrants a national response. The House Report on section 931, by contrast, contained a Congressional Budget Office estimate, based on information from the U.S. Sentencing Commission, that the prohibition on possession of body armor by felons "would probably affect fewer than 10 cases each year." H.R. Rep. No. 107-193, pt. 1, at 7 (2001). Ten criminal cases a year is at the other end of the spectrum from *Lopez* and *Morrison*. The CBO estimate shows that the effect on interstate commerce of felons' possession of body armor is probably negligible and certainly far from substantial.

---

[6](...continued)
which armed criminals wore body armor—a bank shootout in North Hollywood, California, the shooting of a San Francisco police officer after a long gun battle, and the shooting of an Alabama police officer by a drug dealer resisting a search warrant. H.R. Rep. No. 107-193, pt. 1, at 4 (2001).

### 3. *What are the congressional findings?*

Analysis of the effect of felons' possession of body armor is facilitated by Congress's "specific findings regarding the effects of the prohibited activity on interstate commerce." *Grimmett*, 439 F.3d at 1272. We treat Congress's findings "on essentially factual issues" with "a great deal of deference," *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 330 n.12 (1985), and "[p]roper respect for a co-ordinate branch" requires that we also treat Congress's normative conclusions and constitutional judgments with great respect. *See United States v. Harris*, 106 U.S. (16 Otto) 601, 635 (1883).

Although there were no preambulatory findings enacted as part of the statute, the House Report contained the following formal findings regarding the rationale for section 931:

> (1) nationally, police officers and ordinary citizens are facing increased danger as criminals use more deadly weaponry, body armor, and other sophisticated assault gear;
> (2) crime at the local level is exacerbated by the interstate movement of body armor and other assault gear;
> (3) there is a traffic in body armor moving in or otherwise affecting interstate commerce, and existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power;
> (4) recent incidents, such as the murder of San Francisco Police Officer James Guelff by an assailant wearing 2 layers of body armor, a 1997 bank shoot out in north Hollywood, California, between police and 2 heavily armed suspects outfitted in body armor, and the 1997 murder of Captain Chris McCurley of the Etowah County, Alabama Drug Task Force by a drug dealer shielded by protective body armor, demonstrate the serious threat to community safety posed by criminals who wear body armor during the commission of a violent crime . . . .

-28-

H.R. Rep. 107-193, pt. 1, at 2.

Several of these findings make no mention of interstate commerce. Those that do focus on three points: (1) an interstate market for body armor exists, (2) the interstate movement of body armor increases crime, and (3) federal controls over the interstate market will allow states to control the intrastate trade in body armor. The first two points are surely true, but they were also true in *Lopez*. An interstate market exists for guns and for body armor, and the interstate movement of both can increase crime. Yet in *Lopez* the existence of the market and the incidence of crime did not establish that the prohibited possessions substantially affected interstate commerce. *See Lopez*, 514 U.S. at 563-64 (rejecting the argument that firearm possession substantially affects interstate commerce because it can result in violent crime, which in turn affects insurance and education and thus the national economy).

The congressional findings regarding the existence of an interstate market for body armor would be more meaningful if the statute attempted to suppress or limit that market. As discussed above, however, it does not. Manufacture, distribution, and sale of body armor—even sale of body armor to felons—is entirely lawful, and has not been regulated by Congress. Congressional findings that "crime at the local level is exacerbated by the interstate movement of body armor and other assault gear" and that "there is a traffic in body armor moving in or otherwise affecting interstate commerce," H.R. Rep. No. 107-193, pt. 1, at 2,

while undoubtedly true, do nothing to explain or justify a statute that does not limit the interstate movement of body armor or the traffic in it.

The third point suggests that federal regulation of the interstate traffic in body armor would somehow enable the states themselves to prohibit felons' possession. But thirty-one states already regulate the possession or use of body armor, with an array of legislative approaches.[7] It is thus clear that the federal prohibition does not "enable" state prohibitions. At best, the federal law duplicates the state prohibitions. At worst, it may conflict with a state's policy judgment, *see Jones v. United States*, 529 U.S. 848, 859 (2000) (Stevens, J., concurring) (noting that the severe penalties of the federal criminal arson statute could "effectively displace a policy choice made by the State"); discourage experimentation, *see Lopez*, 514 U.S. at 583 (Kennedy, J., concurring) (suggesting that the Gun-Free School Zones Act "foreclose[d] the States from

---

[7]In fifteen states a person commits a crime or receives a higher sentence for wearing body armor while committing certain crimes (Arizona, Delaware, Georgia, Indiana, Massachusetts, Minnesota, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, West Virginia); in four states, for wearing body armor and possessing a deadly weapon while committing certain crimes (Florida, Kentucky, Utah, Virginia); in five states, for possessing body armor after being convicted of a felony (Alabama, Arizona, Connecticut, Texas, Wisconsin); in six states, for wearing body armor while committing certain crimes or for possessing body armor after being convicted of a felony (California, Illinois, Louisiana, Maryland, Michigan, South Carolina); and in one state, for wearing body armor and possessing a deadly weapon while committing certain crimes or for possessing body armor after being convicted of a felony (Oregon). Additionally, one state that restricts felon possession also requires that sales to private parties be made face-to-face (Connecticut).

experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise"); or even preempt state criminal laws, *see Pennsylvania v. Nelson*, 350 U.S. 497, 504 (1956) (holding that a federal sedition statute preempted the Pennsylvania Sedition Act); *see also* Michael A. Simons, *Prosecutorial Discretion and Prosecution Guidelines: A Case Study in Controlling Federalization*, 75 N.Y.U. L. Rev. 893, 962 n.309 (2000) (noting the "de facto preemption of state and local prosecutions" in the context of crimes implicating federal interests).

Moreover, the findings indicate that this statute falls primarily within an area of traditional regulation by the states, namely protecting "police officers and ordinary citizens" from violent crime. *See Lopez*, 514 U.S. at 561 n.3 (noting the "primary authority" of the states for creating the criminal law (internal quotation marks omitted)); *Morrison*, 529 U.S. at 615-17 (noting areas of traditional state concern and "reject[ing] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce"). Congress was understandably concerned about "the serious threat to community safety posed by criminals who wear body armor during the commission of a violent crime." H.R. Rep. No. 107-193, pt. 1, at 2. Yet in this area the Supreme Court has emphasized the prerogatives of the states. *See, e.g.*, *Morrison*, 529 U.S. at 618 ("The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved

in interstate commerce has always been the province of the States."); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 426 (1821) (Marshall, C.J.) (concluding that Congress has "no general right to punish murder committed within any of the States").[8]  Moreover, as noted above, this statute not only intrudes on an area of traditional state concern but also potentially conflicts with the widespread state regulation that already exists.  *Cf. Lopez*, 514 U.S. at 561 n.3 ("When Congress criminalizes conduct already denounced as criminal by the States, it effects a change in the sensitive relation between federal and state criminal jurisdiction." (internal quotation marks omitted)).  Far from establishing a substantial effect on interstate commerce, these findings raise concerns about federal intrusion and suggest that wearing body armor affects interstate commerce insofar as all crime hurts the economy—an argument the Supreme Court rejected in *Lopez* and *Morrison*.

### 4. *Is there a sufficient jurisdictional hook?*

Finally, we consider "whether the statue's reach was limited by an express jurisdictional element."  *Jeronimo-Bautista*, 425 F.3d at 1269.  As the Court

---

[8]We do not mean to suggest that subjects of traditional state concern are immune from congressional regulation when they fall within Congress's Article I powers.  Our constitutional federalism is based on a one-way enumeration: the question is whether a particular authority has been vested in Congress, not whether it falls within the reserved powers of the states, which are defined only negatively.  But evidence regarding traditional divisions of power between the states and the federal government can help to show how the Constitution's enumerations have been interpreted over time.

explained in *Morrison*, a jurisdictional hook restricting the statute to activities that "'have an explicit connection with or effect on interstate commerce' . . . . may establish that the enactment is in pursuance of Congress' regulation of interstate commerce." 529 U.S. at 612 (quoting *Lopez*, 514 U.S. at 562). A jurisdictional hook is not, however, a talisman that wards off constitutional challenges. *See United States v. Rodia*, 194 F.3d 465, 472-73 (3d Cir. 1999) (rejecting a "hard and fast rule that the presence of a jurisdictional element automatically ensures the constitutionality of a statute"); *United States v. Holston*, 343 F.3d 83, 88 (2d Cir. 2003) (finding the jurisdictional hook factor "superficially met" but not relying on "the mere existence of jurisdictional language purporting to tie criminal conduct to interstate commerce"). As the Eleventh Circuit has recently noted, "where a jurisdictional element is required, a meaningful one, rather than a pretextual incantation evoking the phantasm of commerce, must be offered." *Maxwell*, 2006 WL 1041011, at *7 (internal quotation marks, citations, and alteration omitted). The ultimate inquiry is whether the prohibited activity has a substantial effect on interstate commerce, and the presence of a jurisdictional hook, though certainly helpful, is neither necessary nor sufficient.

The principal practical consequence of a jurisdictional hook is to make a facial constitutional challenge unlikely or impossible, and to direct litigation toward the statutory question of whether, in the particular case, the regulated

-33-

conduct possesses the requisite connection to interstate commerce. *See Jones*, 529 U.S. at 857. In *Jones*, the Supreme Court unanimously held that an alleged violation of the federal arson statute fell outside the statute's jurisdictional hook, which limited application to "'property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce.'" *Id*. at 850-51 (quoting 18 U.S.C. § 844(i)). The government argued that the jurisdictional hook was satisfied because the burned home was used in three activities affecting interstate commerce: securing a mortgage from an out-of-state lender, obtaining a casualty insurance policy from an out-of-state insurer, and receiving natural gas from out-of-state sources. *Id.* at 855. The Court rejected this "expansive interpretation" in part because "[p]ractically every building in our cities, towns, and rural areas is constructed with supplies that have moved in interstate commerce, served by utilities that have an interstate connection, financed or insured by enterprises that do business across state lines, or bears some other trace of interstate commerce." *Id*. at 857. In *Jones*, therefore, the jurisdictional hook served the purpose of limiting the statute to arson cases where there really was a substantial and non-attenuated effect on interstate commerce.

The statute under which Mr. Patton was charged also has a jurisdictional hook, but it does not seriously limit the reach of the statute. The jurisdictional hook, § 921(a)(35), limits the definition of "body armor" to "any product sold or offered for sale, in interstate or foreign commerce, as personal protective body

covering intended to protect against gunfire."  Nearly all body armor will meet that test.  More important, there is no reason to think that possession of body armor that satisfies the jurisdictional hook has any greater effect on interstate commerce than possession of any other body armor.

If Congress intended to suppress the interstate market in body armor, then directing a prohibition on possession towards armor that had moved in interstate commerce would make sense.  *Cf. Wickard*, 317 U.S. at 128 ("One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market.").  Where Congress has chosen to allow production, distribution, and sale of body armor in interstate commerce, however, it is hard to understand why possession of armor that meets that description is more objectionable than any other.  *See Holston*, 343 F.3d at 89 (questioning the effectiveness of a jurisdictional hook when "the interstate component underpinning the jurisdictional element, for example, the shipment of a video camera, is attenuated from the criminal conduct—the production of child pornography—which occurs entirely locally").

A jurisdictional hook that restricts a statute to items that bear a "trace of interstate commerce" is no restriction at all.  *Jones*, 529 U.S. at 857.  To apply the body armor statute to every case where body armor was once sold across state lines would therefore replicate the government's error in *Jones*.  If the jurisdictional hook had limited application of the statute to cases where the felon

-35-

used body armor during commission of a crime that affected interstate commerce, we would know exactly what Congress's theory of its authority is. We would then be able to evaluate whether, on the facts of the case, the substantial and non-attenuated connection to interstate commerce that Congress expected was present. As it is, however, section 931's requirement that the body armor must once have traveled in interstate commerce is so sweeping as to be unhelpful in determining whether the activities regulated by the statute have a substantial and non-attenuated effect on interstate commerce.

Given that Mr. Patton's possession was not interstate, not commercial, and not an essential part of a comprehensive scheme of economic regulation, that his use of the bulletproof vest was in self-defense and not connected to crimes that might affect interstate commerce, and in light of the CBO's prediction that the statute would be applied fewer than ten times a year, we find no rational basis for concluding that the possession of body armor prohibited by section 931 substantially affects interstate commerce. We thus conclude that 18 U.S.C. § 931 cannot be justified as a regulation of the channels of commerce, as a protection of the instrumentalities of commerce, or as a regulation of intrastate activity that substantially affects interstate commerce.

### D. *Scarborough v. United States*

Although the body armor statute does not fit within any of the *Lopez* categories, it is supported by the pre-*Lopez* precedent of *Scarborough v. United*

-36-

*States*, 431 U.S. 563, 575 (1977), which held that Congress intended a felon-in-possession statute to prohibit possession of any firearm that had moved in interstate commerce. *Scarborough* decided only a question of statutory interpretation about a previous version of the felon-in-possession statute, but the decision assumed that Congress could constitutionally regulate the possession of firearms solely because they had previously moved across state lines. *See* Brent E. Newton, *Felons, Firearms, and Federalism: Reconsidering* Scarborough *in Light of* Lopez, 3 J. App. Practice & Process 671, 674 (2001).

The constitutional understanding implicit in *Scarborough*—that Congress may regulate any firearm that has ever traversed state lines—has been repeatedly adopted for felon-in-possession statutes by this Court. In *United States v. Bolton*, 68 F.3d 396 (10th Cir. 1995), we announced without fanfare that the post-*Lopez* jurisdictional hook in § 922(g) was enough to ensure constitutionality. *Id.* at 400 ("Section 922(g)'s requirement that the firearm have been, at some time, in interstate commerce is sufficient to establish its constitutionality under the Commerce Clause." (internal quotation marks omitted)). In *United States v. Farnsworth*, 92 F.3d 1001, 1006 (10th Cir. 1996), following *Bolton*, we rejected an as-applied challenge and found it sufficient that the defendant's "gun had been manufactured in a different state from that in which it was found." 92 F.3d at 1006. Most recently, in *United States v. Dorris*, 236 F.3d 582 (10th Cir. 2000), we considered a challenge based not only on *Lopez* but also on *Morrison* and

*Jones*. In rejecting the challenge, we based our holding squarely on *Scarborough* and on our own line of precedents, even though in dicta we described § 922(g)(1) as a regulation of "items sent in interstate commerce, and the channels of commerce themselves." *Dorris*, 236 F.3d at 584-86 (calling *Scarborough* a case in which "the Supreme Court passed on the very question Mr. Dorris presents us" and noting that "[t]his Court has twice considered § 922(g)(1)'s post-*Lopez* constitutionality in *Bolton* and *Farnsworth*").

Other circuits have similarly continued to follow *Scarborough*, though some have expressed doubts about its continuing validity. *See, e.g.*, *United States v. Weems*, 322 F.3d 18, 26 (1st Cir. 2003) (considering *Scarborough* to be unaltered by *Jones*); *United States v. Lemons*, 302 F.3d 769, 773 (7th Cir. 2002) (noting "ample Seventh Circuit precedent" upholding § 922(g)(1) because of its jurisdictional hook and suggesting that if *Lopez* undercuts this approach, "it is for the Supreme Court to so hold"); *United States v. Cortes*, 299 F.3d 1030, 1037 n.2 (9th Cir. 2002) (noting that doubts have been raised but choosing, "[u]ntil the Supreme Court tells us otherwise," to "follow *Scarborough* unwaveringly"); *United States v. Kirk*, 105 F.3d 997, 1004 (5th Cir. 1997) (evenly divided court en banc) (Higginbotham, J.) (upholding § 922(o), the ban on possession of machine guns, but relying on the third *Lopez* category instead of the more expansive approach in *United States v. Bass*, 404 U.S. 336, 350 (1971), a predecessor case to *Scarborough*, and noting that "[i]t is not for us to say that *Bass* cannot survive

*Lopez*”); *id.* at 1016 n.25 (Jones, J.) (finding the statute unconstitutional under the three *Lopez* categories yet noting that “[w]e are not at liberty to question” *Scarborough*, despite its “tension” with *Lopez*); *United States v. Smith*, 101 F.3d 202, 215 (1st Cir. 1996) (holding that *Scarborough*, not *Lopez*, applies to statues with a jurisdictional hook); *United States v. Kuban*, 94 F.3d 971, 973 n.4 (5th Cir. 1996) (noting the “powerful argument” against the constitutionality of § 922(g)(1) but regarding *Scarborough* “as barring the way” for an “inferior federal court”); *id.* at 976-78 (DeMoss, J., dissenting in part) (distinguishing the statute in *Scarborough* and finding its holding “in fundamental and irreconcilable conflict with the rationale” of *Lopez*); *United States v. Chesney*, 86 F.3d 564, 571 (6th Cir. 1996) (following *Scarborough*); *id.* at 577-82 (Batchelder, J., concurring) (distinguishing *Scarborough* because it did not reach the constitutional question, concluding that despite its jurisdictional hook § 922(g)(1) fits none of the *Lopez* categories, but nevertheless concurring because of prior Sixth Circuit precedent); *United States v. Shelton*, 66 F.3d 991, 992 (8th Cir. 1995) (per curiam) (following *Scarborough*); *United States v. Bishop*, 66 F.3d 569, 587-88 & n.28 (3d Cir. 1995) (upholding 18 U.S.C. § 2119, a carjacking statute, because of its jurisdictional hook and noting that until the Supreme Court is more explicit on the relationship between *Lopez* and *Scarborough* a lower court is “not at liberty to overrule existing Supreme Court precedent”); *id.* at 593-97 & n.13 (Becker, J., concurring in part and dissenting in part) (criticizing the majority for relying on

-39-

*Scarborough*, which "was devoid of any Commerce Clause analysis," and insisting that a jurisdictional hook could make an application of a statute constitutional only if it also fell within one of the three *Lopez* categories); *but see United States v. Luna*, 165 F.3d 316, 321 n.16 (5th Cir. 1999) (noting "the uncertainty surrounding the application of *Scarborough*" and instead basing its holding on the *Lopez* categories).

The two courts outside this Circuit that have considered the constitutionality of 18 U.S.C. § 931 have taken a similar approach. One found the question controlled by *Scarborough* and Third Circuit precedents upholding 18 U.S.C. § 922(g). *See United States v. Kitsch*, 307 F. Supp. 2d 657, 660-61 (E.D. Pa. 2004). The other relied on Sixth Circuit precedents upholding § 922(g), the presence of the jurisdictional hook, and the persuasive authority of *Kitsch*. *See United States v. Marler*, 402 F. Supp. 2d 852, 854-55 (N.D. Ohio 2005).

Because Mr. Patton's bulletproof vest moved across state lines at some point in its existence, Congress may regulate it under *Scarborough*, even though it does not fall within any of the three categories the Court now recognizes for Commerce Clause authority. The prohibition on possessing body armor cannot be distinguished from the prohibitions on possessing firearms that we have upheld. As noted above, firearms are more broadly regulated than body armor. But in *Bolton*, *Farnsworth*, and *Dorris* this Court never treated the constitutionality of the firearm statutes as turning on the scope of the regulatory scheme.

Consequently, this difference between body armor and firearms is not relevant under the *Scarborough* line of analysis. Following our precedent, we conclude that 18 U.S.C. § 931 does not exceed congressional power under the Commerce Clause.

Like our sister circuits, we see considerable tension between *Scarborough* and the three-category approach adopted by the Supreme Court in its recent Commerce Clause cases, and like our sister circuits, we conclude that we are bound by *Scarborough*, which was left intact by *Lopez*. Even if we were not persuaded that *Scarborough* remains "the case which directly controls," *Agostini v. Felton*, 521 U.S. 203, 237 (1997), we would still be compelled to follow its reasoning by prior decisions of this Court, which have continued to adhere to *Scarborough* despite *Lopez* and the subsequent cases. *See Bolton*, 68 F.3d at 400; *Farnsworth*, 92 F.3d at 1006; *Dorris*, 236 F.3d at 584-86. Any doctrinal inconsistency between *Scarborough* and the Supreme Court's more recent decisions is not for this Court to remedy. *Agostini*, 521 U.S. at 237. We suspect the Supreme Court will revisit this issue in an appropriate case—maybe even this one.

### III. Due Process

Mr. Patton's remaining constitutional arguments may be disposed of quickly. He makes two as-applied challenges to the statute under the Due Process Clause of the Fifth Amendment. The first is that the statute deprived him of

-41-

property he had legitimately acquired, namely the bulletproof vest, without due process of law.

As the government points out, Mr. Patton cites no authority in support of his argument. But his claim is reminiscent of that in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 450, 452 (1857), which held that a slaveholder was deprived of his putative property, without due process of law, by territorial legislation barring slavery. The argument is no more persuasive now than it was then. *See id.* at 627 (Curtis, J., dissenting). It is not unconstitutional for Congress or a state legislature to forbid possession of a previously licit good, or to forbid a class of persons from possessing an item they had been permitted to possess. *Samuels v. McCurdy*, 267 U.S. 188, 194-99 (1925) (holding that a state does not violate the Due Process Clause of the Fourteenth Amendment by prohibiting the possession of lawfully acquired goods). Such legislation may, in a sense, be a deprivation of property, but if the legislation is duly enacted and enforced through proper procedures, there is no denial of due process of law. *See Helton v. Hunt*, 330 F.3d 242, 247 (4th Cir. 2003) (sustaining a due process challenge to a statute "providing for the destruction of video gaming machines without any process whatsoever").

Mr. Patton's second due process argument is that he has a right of self-protection. With no assurance of government safekeeping, Mr. Patton had to protect himself "from his enemies on the street." Br. for Appellant 15. The

-42-

federal government prevented him from doing so, he claims, by taking away his one legal means of self-protection, the bulletproof vest.

The Due Process Clause of the Fifth Amendment does not give Mr. Patton the right to protect himself through unlawful means. As Mr. Patton concedes, the government does not have a constitutional obligation to protect a person's life, liberty, and property from harm inflicted by third parties. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). There are two exceptions to this rule, when the government involuntarily restrains a person ("special relationship") and when the government creates the danger ("danger creation"). *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1260 (10th Cir. 1998). Although some language in our previous cases supports Mr. Patton's claim, *see, e.g.*, *Armijo*, 159 F.3d at 1261 (describing the "special relationship" exception as applying when "the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty"), the prohibition on possessing body armor does not create a "special relationship." We have found such a relationship only in the case of persons who depend "'completely on the state to satisfy their basic human needs'"—for example, prisoners, those involuntarily committed to mental institutions, and foster children. *DeAnzona v. City & County of Denver*, 222 F.3d 1229, 1234 (10th Cir. 2000) (quoting *Maldonado v. Josey*, 975 F.2d 727, 732-33 (10th Cir. 1992)). The federal government restricted Mr. Patton's freedom of

movement and forbade him to possess body armor, but it did not feed, clothe, and house him; no "special relationship" existed. It is also clear that the government did not create the danger to Mr. Patton. As a result, whatever the nature of Mr. Patton's interest in self-protection, the ban on his possession of body armor does not violate the Due Process Clause.

## IV. The Necessity Defense

Mr. Patton also challenges the district court's exclusion of his "modified justification defense." Br. for Appellant 18. Although Mr. Patton declines to confine his defense to conventional legal categories such as necessity or duress, in substance this is a necessity defense, and we review the district court's denial of a necessity defense for abuse of discretion. *See United States v. Seward*, 687 F.2d 1270, 1276 (10th Cir. 1982) (en banc) (concluding that the district court did not abuse its discretion by denying the requested instruction for a necessity defense); *see also United States v. Meraz-Valeta*, 26 F.3d 992, 995 (10th Cir. 1994), *overruled on other grounds by United States v. Aguirre-Tello*, 353 F.3d 1199 (10th Cir. 2004) (en banc). We have not always been consistent about the standard of review for a district court's denial of a requested defense instruction, *see Fed. Deposit Ins. Corp. v. UMIC, Inc.*, 136 F.3d 1375, 1382 (10th Cir. 1998) (citing one case each for *de novo* and abuse of discretion), and we recognize that other circuits use *de novo* review for this essentially legal question, *see, e.g.*, *United States v. Cervantes-Flores*, 421 F.3d 825, 828 (9th Cir. 2005) (per

-44-

curiam). Nevertheless, our standard of review is controlled by this Court's en banc decision in *Seward* and the panel decision in *Meraz-Valeta*.

Mr. Patton's argument assumes that a federal common law defense of necessity exists, and the government does not contend otherwise. Even though the Supreme Court has called it "an open question whether federal courts ever have authority to recognize a necessity defense not provided by statute," *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 490 (2001), this Court has recognized a common law defense of necessity. *See Seward*, 687 F.2d at 1276 (holding that the defendant did not meet the requirements of the necessity defense); *cf.* Frank Easterbrook, *The Case of the Speluncean Explorers: Revisited*, 112 Harv. L. Rev. 1913, 1913-14 (1999) ("All three branches of government historically have been entitled to assess claims of justification—the legislature by specifying the prohibition and allowing exceptions, the executive by declining to prosecute (or by pardon after conviction), and the judiciary by developing defenses."). We therefore assume that a federal necessity defense exists.

The district court granted the government's motion in limine to exclude Mr. Patton's "modified justification defense," finding as a matter of law that Mr. Patton had not asserted facts sufficient to support it. In effect, Mr. Patton is asking for a necessity defense without the usual imminence requirement. He proposes this less rigorous variant of the necessity defense primarily on the

grounds that his crime threatened no one. He also argues that in his case the "risk of harm [was] more omnipresent than imminent." Br. for Appellant 21.

Mr. Patton, then, is asking us to restructure the requirements of the necessity defense for purportedly "victimless" crimes. Others have made the same suggestion. *See, e.g.*, Model Penal Code § 3.02(1)(a) (offering a "choice of evils" defense that does not require imminence but does require that "the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged"); Lawrence P. Tiffany & Carl A. Anderson, *Legislating the Necessity Defense in Criminal Law*, 52 Denv. L.J. 839, 854 (1975) ("No matter how improbable or temporally remote the threatened harm, should not the scales be tipped in favor of a defendant who sought to avoid that threatened harm by an act that posed no threat to anyone?"); *Aldrich v. Wright*, 53 N.H. 398, 1873 WL 4187, at *5 (1873). We do not decide whether there are ever circumstances in which the imminence requirement should be relaxed, but we decline to create an exception in this case. We do so for two reasons. First, given the uncertainty surrounding judge-made defenses to federal crimes, *Oakland Cannabis Buyers' Coop.*, 532 U.S. at 490, we are reluctant to refashion the traditional requirements. Second, to allow Mr. Patton's modified necessity defense for section 931 might effectively read the statute out of existence. Congress made the decision to criminalize possession of body armor by a class of individuals who have threatened others and are likely to be

threatened themselves—i.e., those who have been convicted of a violent felony—and allowing them to violate the statue whenever they live in dangerous circumstances might cause the defense to swallow up the crime.

Mr. Patton must therefore meet the traditional common law requirements of the necessity defense: "(1) there is no legal alternative to violating the law, (2) the harm to be prevented is imminent, and (3) a direct, causal relationship is reasonably anticipated to exist between the defendant's action and the avoidance of harm." *Meraz-Valeta*, 26 F.3d at 995. We need not consider the first and third requirements because Mr. Patton clearly does not meet the traditional requirement of imminence, as Mr. Patton himself concedes. We thus conclude that the district court did not abuse its discretion by granting the government's motion in limine to exclude Mr. Patton's modified necessity defense.

## V. Conclusion

Because we reject Mr. Patton's constitutional claims and uphold the district court's exclusion of the necessity defense, we **AFFIRM** the conviction.