HARTZ, Circuit Judge, dissenting.
In 2014, Defendant, 19 years old at the time, made his fourth missionary trip from the United States to Kenya to volunteer at a home for impoverished children. A jury acquitted him of traveling with the intent to engage in illicit sexual conduct. But he did engage in illicit sexual conduct after his travel to Kenya. While living at the home, he sexually assaulted a number of the boys and girls he was supposed to be helping. Kenyan police said they could not arrest him, and he was permitted to return to the United States. A federal jury convicted him of the offenses he committed after he arrived in Kenya.
Defendant's offenses were horrific. The only question is whether the United States *1241 could properly prosecute him. The government asserts that Congress had the authority to criminalize Defendant's behavior under the Constitution's Foreign Commerce Clause because such conduct has a substantial effect on foreign commerce. The panel majority agrees. I respectfully dissent.
The only foreign "commerce" identified by the government is commercial sex trafficking of children. I do not dispute that such trafficking is within the purview of the Foreign Commerce Clause.[1] But (1) there is no evidence in this case of any commercial sexual activity, (2) I fail to see how conduct like that of Defendant has any impact on commercial sexual activity, and (3) no one has presented to this court any evidence of such a connection. If Congress has authority under the Foreign Commerce Clause to criminalize Defendant's actions, it has power to criminalize any conduct by Americans abroad.
In my view, the Foreign Commerce Clause does not authorize Congress to prohibit noncommercial sexual assaults, no matter how heinous, committed by Americans abroad who formed the intent to commit the acts after arriving abroad. The Interstate Commerce Clause would not permit Congress to prohibit noncommercial sexual assaults within a State, even if the perpetrator had traveled from another State, so long as the perpetrator did not form the intent to commit the act before arriving in the State where the crime was perpetrated. The majority suggests that even if the Interstate Commerce Clause would not authorize the domestic statute, a statute governing conduct abroad would be valid under the Foreign Commerce Clause because it conveys more expansive power than does the Interstate Commerce Clause and the Foreign Commerce Clause is not limited by concerns about state sovereignty. But these suggestions are not persuasive. The limits on congressional authority under the Interstate Commerce Clause are based on the Supreme Court's understanding of what it means to regulate commerce and the understanding that provisions of a constitution creating a government of limited power should not be interpreted in a way that would confer general police power. Although federal power under the Foreign Commerce Clause exceeds that under the Interstate Commerce Clause in some respects-in particular, the Foreign Commerce Clause restricts state regulation of foreign commerce because of the need for this country to speak with one voice in foreign affairs-this additional power is irrelevant in the present context.
This dissent will travel much of the same ground as the panel opinion. But, as might be expected, my description of the terrain will be somewhat different.
I. The Charge
Defendant was convicted under 18 U.S.C. § 2423(c), which is part of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act (PROTECT Act) enacted in 2003. Section 105 of the Act, entitled "Penalties Against Sex Tourism," amended § 2423 to add a subsection (b) entitled "Travel with intent to engage in illicit sexual conduct"[2] and a subsection (c) entitled "Engaging in *1242 illicit sexual conduct in foreign places."[3] In subsection (f) it defines illicit sexual conduct to include commercial sex acts with persons under 18, production of child pornography, and sexual acts with persons under 18 that would violate chapter 109A of the federal criminal code if committed in federal territorial jurisdiction.[4] The jury found that Defendant engaged in conduct described in Chapter 109A. He was not charged with committing any commercial sex act, which is defined in 18 U.S.C. § 1591 as "any sex act, on account of which anything of value is given to or received by any person." And he was acquitted of a charge under § 2423(b), which requires that the defendant "travel[ ] in foreign commerce, for the purpose of engaging in any illicit sexual conduct."
The question before the court is whether the power to regulate commerce with foreign nations includes the power to punish Americans who traveled to a foreign nation and then, in what was not a commercial sex act, decided to and did molest a child there. To answer the question requires a deep dive into the Foreign Commerce Clause.
II. The Commerce Clause
The Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art.1, § 8, cl. 3. Almost two centuries ago Chief Justice Marshall noted the commonality of the three clauses within the Commerce Clause-the Foreign Commerce Clause, the Interstate Commerce Clause, and the Indian Commerce Clause-in an opinion construing the meaning of the Interstate Commerce Clause. He wrote, "It has been truly said, that commerce, as the word is used in the constitution, is a unit, every part of which is indicated by the term." Gibbons v. Ogden , 22 U.S. (9 Wheat.) 1, 194, 6 L.Ed. 23 (1824). Having previously stated the accepted meaning of commerce in the context of international trade, he concluded that "the word ... must carry the same meaning throughout the sentence, and remain a unit, unless there be some plain intelligible cause which alters it." Id . I would infer that the same proposition applies to the word regulate in the Clause. Thus, when interpreting the Foreign Commerce Clause to resolve this case, one can look to Supreme Court doctrine under the other commerce clauses, while recognizing that there may well be "plain intelligible cause[s]" that require differentiation among the clauses. I begin with a brief explanation of why I think that doctrine *1243 under the Indian Commerce Clause teaches little about how to interpret the Foreign Commerce Clause in the context of this case, and then I compare the Foreign Commerce Clause and the Interstate Commerce Clause.
A. The Indian Commerce Clause
The constitutional provision containing the Interstate Commerce Clause and the Foreign Commerce Clause also grants congressional power "[t]o regulate Commerce ... with the Indian Tribes." U.S. Const. art. 1, § 8, cl. 3. The Supreme Court has described the federal power "to legislate in respect to Indian tribes ... as plenary and exclusive." United States v. Lara , 541 U.S. 193, 200, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004) (internal quotation marks omitted). That plenary power has been exercised so far as to impose federal criminal law within Indian territory. See, e.g. , 18 U.S.C. § 1153 (major crimes by Indians committed in Indian country). Is similar authority conveyed under the Foreign Commerce Clause? After all, at first glance the Indian Commerce Clause would appear to be a close relative of the Foreign Commerce Clause. The relationship between this nation and Indian tribes has much in common with the relationship between this nation and foreign nations. At the time of the Founding (and long after), the tribes were treated as sovereignties with which this country entered into treaties.
On closer inspection, however, the comparison cannot be sustained. Although the Indian Commerce Clause was juxtaposed with the other two commerce clauses, it was a late add-on at the constitutional convention, see Albert S. Abel, The Commerce Clause in the Constitutional Convention and in Contemporary Comment , 25 Minn. L. Rev. 432, 467 (1941) (Abel) (the clauses granting the other two commerce powers "had been published by the committee of detail two weeks ... before the subject of the Indian trade was introduced on the floor of the convention"); and, more importantly, the Indian-commerce power was a special subject never discussed in relation to the other two powers, see id. at 468 ("Whatever regulation of commerce might mean in connection with transactions with the Indians, it was so distinct and specialized a subject [at the Convention] as to afford no basis for argument as to the meaning of the rest of the clause.").
Moreover, congressional power over Indian tribes does not derive just from the Commerce Clause. As additional sources of "plenary and exclusive" power with respect to Indian tribes, which have been described by the Court as "dependent sovereign[s]" that are not States, Lara , 541 U.S. at 203, 124 S.Ct. 1628 (emphasis added), the Supreme Court has identified the Treaty Clause, the Property Clause, and "preconstitutional powers necessarily inherent in any Federal Government, namely, powers that this Court has described as 'necessary concomitants of nationality,' " id. at 200-01, 124 S.Ct. 1628. And it has pointed to the federal government's assumption of "guardian-ward" status with respect to Indian Tribes as a source for Congress's "plenary power ... to deal with the special problems of Indians." Morton v. Mancari , 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). Given this unique status of Indians in our constitutional system, I think that one can learn very little about Foreign Commerce Clause power over Americans in foreign nations (the situation presented in this appeal) by examining congressional authority in Indian country.
B. The Interstate Commerce Clause
The component of the Commerce Clause that has bred the most Supreme Court doctrine is the Interstate Commerce *1244 Clause. Although, as Chief Justice Marshall suggested, special considerations pertinent to each clause preclude mechanical application to one clause of doctrine regarding another, I first consider interstate-commerce doctrine and then address what, if any, adjustments are needed.
I begin with propositions regarding interstate commerce that are derived from notions of international commerce. Chief Justice Marshall's description of commerce was adopted by Chief Justice Rehnquist in United States v. Lopez , 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) : " 'Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse,' " id . at 553, 115 S.Ct. 1624 (quoting Gibbons , 22 U.S. at 189-90 ). But "limitations on the commerce power are inherent in the very language of the Commerce Clause." Id. Again quoting Chief Justice Marshall:
It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient, and is certainly unnecessary.
... The enumeration presupposes something not enumerated; and that something, if I regard the language, or the subject of the sentence, must be the exclusively internal commerce of a State.
Id . (quoting Gibbons , 22 U.S. at 194-95 ). In recognition of these limitations, the Supreme Court has identified "three categories of regulations permitted by the Interstate Commerce Clause: (1) regulation of " 'use of the channels of interstate commerce' "; (2) regulation of " 'instrumentalities of interstate commerce, or persons or things in interstate commerce' "; and (3) regulation of " 'activities that substantially affect interstate commerce.' " People for Ethical Treatment of Prop. Owners v. United States Fish & Wildlife Serv. , 852 F.3d 990, 1000 (10th Cir. 2017) (quoting Lopez , 514 U.S. at 558-59, 115 S.Ct. 1624 ).
Under the first category Congress can bar a class of goods or people from the channels of commerce because they are deemed to be tainted by "immoral [or] injurious uses." United States v. Patton , 451 F.3d 615, 621 (10th Cir. 2006). Thus, Congress can ban the interstate transportation of kidnapped persons or stolen goods, see Perez v. United States , 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) ; of women for the purpose of prostitution, see Caminetti v. United States , 242 U.S. 470, 491-92, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ; of plural wives for the purpose of polygamy, see Cleveland v. United States , 329 U.S. 14, 18, 67 S.Ct. 13, 91 L.Ed. 12 (1946) ; of lottery tickets, see Champion v. Ames , 188 U.S. 321, 354-55, 23 S.Ct. 321, 47 L.Ed. 492 (1903) ; or of goods produced by underpaid workers, see United States v. Darby , 312 U.S. 100, 112-14, 61 S.Ct. 451, 85 L.Ed. 609 (1941). These cases illustrate that this regulatory authority is not limited to legislation targeting commercial activities. See Heart of Atlanta Motel, Inc. v. United States , 379 U.S. 241, 256, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).
Under the second category Congress can regulate "the means of interstate commerce"-such as ships, railroads, airplanes, and the telegraph; can regulate "intrastate activities that threaten these instrumentalities"; and can protect "the persons or things that the instrumentalities are moving." Patton , 451 F.3d at 622. For example, Congress can ban the destruction of aircraft or theft from interstate *1245 shipments. See Perez , 402 U.S. at 150, 91 S.Ct. 1357.
Under the third category Congress can regulate activities, even intrastate and noncommercial activities, if "Congress ha[s] a rational basis to find that the regulated activity, taken in the aggregate, would substantially affect interstate commerce." Patton , 451 F.3d at 623. This authority permits Congress to restrict a farmer's production of wheat for his own use when the restriction's purpose is to boost the price of wheat in commerce. See Wickard v. Filburn , 317 U.S. 111, 127-29, 63 S.Ct. 82, 87 L.Ed. 122 (1942) ; id . at 115, 63 S.Ct. 82 (the statute was designed "to control the volume [of wheat] moving in interstate and foreign commerce in order to avoid surpluses and shortages," thereby controlling the price). This authority also permits Congress to control marijuana in national commerce by barring the noncommercial cultivation, possession, and use of marijuana for personal medical purposes. See Gonzales v. Raich , 545 U.S. 1, 25-33, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005). To determine whether a statute is authorized under this category, courts consider (1) whether the regulated activity is commercial or economic; (2) the relation of the regulated activity to interstate commerce; (3) congressional findings about the effects of the regulated activity on commerce; and (4) whether the statute is limited to activities having an explicit connection to interstate commerce-a so-called jurisdictional hook. See Patton , 451 F.3d at 624, 626, 630, 632.
When the regulated activity is commercial, the regulation is generally permissible, given how integrated our national economy is. See id. at 623. Otherwise, "the last three factors are significant." Id. at 624. Because almost any human activity could be said to have some effect on commerce, the Supreme Court has carefully examined the relationship of the regulated activity to commerce to be sure that the Commerce Clause power is not rendered so expansive as to supersede all the other grants of power under the Constitution. In particular, an effect cannot be considered "substantial" if inclusion of such effects would as a practical matter confer a plenary police power, contrary to the notion that the Constitution established a government of limited powers. In United States v. Lopez, 514 U.S. at 549, 115 S.Ct. 1624, the Court invalidated a federal statute prohibiting possession of a firearm in a school zone, despite arguments that such possession may result in violent crime, which can affect the national economy (1) because the costs imposed are spread throughout the population, (2) because fear of violence deters individuals from traveling to unsafe areas, and (3) because the threat to the educational system will reduce the productivity of the citizenry. See id. at 567-68, 115 S.Ct. 1624 (to expand interstate-commerce power to encompass the statute "would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local" (citation omitted) ). And in United States v. Morrison , 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the Court invalidated a federal civil remedy for the victims of gender-motivated crimes of violence, rejecting arguments that gender-motivated violence affects interstate commerce because it can deter interstate travel, engaging in interstate business, etc. See id. at 617-18, 120 S.Ct. 1740 ("The Constitution requires a distinction between what is truly national and what is truly local.... The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States."). The problem with the statutes in Lopez *1246 and Morrison was not that it was irrational to think that the regulated activities would affect commerce, but that the effect was so indirect-and therefore not "substantial"-that to uphold the statute would be to uphold unlimited Commerce Clause power. See Patton , 451 F.3d at 629 ( Lopez and Morrison rejected the government's arguments "largely on the ground that, if accepted, similar effects could be invoked in every case, and the Commerce Clause would become, in effect, a grant of general governing authority").
It is important to keep in mind this limitation on the third category of regulation under the Commerce Clause-the regulation of activities that substantially affect interstate commerce-when considering the scope of the first two categories-(1) the regulation of the use of the channels of commerce and (2) the regulation of the instrumentalities of commerce and persons or things in interstate commerce. The first two categories are qualitatively different from the third. "The first two categories are self-evident, since they are the ingredients of interstate commerce itself." Raich , 545 U.S. at 34, 125 S.Ct. 2195 (Scalia, J., concurring). "[A]ctivities that substantially affect interstate commerce [, however,] are not themselves part of interstate commerce." Id. Regulation in the first two categories can be upheld just by identifying what is being regulated-the use of the channels of interstate commerce, or instrumentalities of interstate commerce, or persons or things in interstate commerce. But determining the propriety of regulation under the third category requires more. The courts must determine whether the activity being regulated has a causal connection to interstate commerce that can properly be deemed "substantial." An improper expansion of either of the first two categories to encompass regulation that properly belongs within the third category therefore would evade the constitutional constraints imposed on the third category of regulation. For example, this court has said that under the channels category, "Congress regulates not conduct related to interstate commerce but rather interstate commerce itself, barring from the channels of interstate commerce a class of goods or people"; and the court described that category of regulation as being "confined to statutes that regulate interstate transportation itself, not manufacture before shipment or use after shipment." Patton , 451 F.3d at 621. The court concluded that "[a] prohibition on the mere intrastate possession of body armor cannot be upheld under Congress's power to regulate the channels of interstate commerce." Id.
Finally, one aspect of the Supreme Court's three-part test is often overlooked. The division of interstate-commerce regulation into three categories is less a policy matter than it is definitional. To my knowledge, no one has suggested that there is some other type of possible regulation outside of those categories. Controversy concerns only whether one of those types of regulation is permitted at all by the Constitution, see Nat'l Fed'n of Indep. Bus. v. Sebelius , 567 U.S. 519, 132 S.Ct. 2566, 2677, 183 L.Ed.2d (2012) (Thomas, J., dissenting) (stating that there is no constitutional power to regulate activity simply because it has a "substantial effect" on commerce), or what is the proper scope of one of the categories (such as the question of how substantial the effect on commerce must be).
C. The Foreign Commerce Clause
I next consider how much of this Interstate Commerce Clause doctrine translates to the Foreign Commerce Clause. How much of the doctrine should be carried over and how much is not applicable because of some special consideration-that *1247 is, in the words of Ogden, 22 U.S. at 194, because of some "plain intelligible cause"? In particular, how should one analyze congressional authority under the Foreign Commerce Clause over conduct of Americans abroad, as in the case before us?
The critical question is when, if ever, the terms commerce and regulate have a different meaning under the Foreign Commerce Clause than they do under the Interstate Commerce Clause. As previously noted, Chief Justice Marshall indicated the general rule that they are understood as having the same meaning in the foreign and domestic context, saying: "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." Gibbons , 22 U.S. at 189-90. Unfortunately, however, there are no Supreme Court opinions on whether the terms have distinct meetings in the context of regulation of the conduct of Americans abroad.
The Court's only decisions on the Foreign Commerce Clause have concerned the scope of the Clause with respect to conduct within the borders of the United States and, consequently, the relative powers of the federal and state governments under the Clause. Typical of the early opinions interpreting the Clause, in Board of Trustees of University of Illinois v. United States , 289 U.S. 48, 56, 53 S.Ct. 509, 77 L.Ed. 1025 (1933), the Court rejected a claim that a university could not be required to pay customs duties on imported scientific apparatus because the school was an instrumentality of the State. See id. at 56-59, 53 S.Ct. 509. The Court emphasized the preeminence of federal power over states' rights in this field: "To permit the states and their instrumentalities to import commodities for their own use, regardless of the requirements imposed by the Congress, would undermine, if not destroy, the single control which it was one of the dominant purposes of the Constitution to create." Id. at 59, 53 S.Ct. 509. In that case there could be no question that the federal law-which imposed a customs duty on imported equipment-was a regulation of foreign commerce. The argument to the court was that there should be an exemption from that regulation for state entities. And the Court rejected the argument, noting the importance of not allowing variation among the States.
Fifty years later, in Japan Line, Ltd. v. County of Los Angeles , 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), the Court considered not the powers of Congress, but the limits that the power given to Congress under the Foreign Commerce Clause implicitly places on the powers of the States in the absence of federal legislation-the so-called dormant Foreign Commerce Clause. The State of California sought to assess an ad valorem property tax on cargo containers aboard Japanese ships temporarily docked in California's ports. See id. at 436-37, 99 S.Ct. 1813. The Japanese owner of the containers objected that the State lacked the power to burden foreign commerce in this way. See id. at 437-38, 99 S.Ct. 1813. The Court agreed, holding that the dormant Foreign Commerce Clause vests in the federal government the exclusive power to regulate commerce with foreign nations and forbids the tax. See id. at 453-54, 99 S.Ct. 1813.
There was no question that the activity at issue in Japan Line s was regulation of foreign commerce. The question was the extent to which the States shared this regulatory power with the federal government. What the Court held was that the dormant Foreign Commerce Clause limited the powers of States to regulate foreign commerce more than the Interstate Commerce Clause limits the powers of States *1248 to regulate interstate commerce. Indeed, the Court assumed that the California tax would be lawful if applied to goods transported in interstate commerce. Under the dormant Interstate Commerce Clause test set forth in Complete Auto Transit, Inc. v. Brady , 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), a tax does not impose an impermissible burden on interstate commerce if it " 'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.' " Japan Line, 441 U.S. at 444-45, 99 S.Ct. 1813 (quoting Complete Auto, 430 U.S. at 279, 97 S.Ct. 1076 ). The Court said, however, that "two additional considerations" are at play under the Foreign Commerce Clause. Id. at 446, 99 S.Ct. 1813. One is the imperative, mentioned in Board of Trustees , 289 U.S. at 59, 53 S.Ct. 509, that the country "speak with one voice when regulating commercial relations with foreign governments." Japan Line , 441 U.S. at 449, 99 S.Ct. 1813 (internal quotation marks omitted). State taxes on foreign commerce could generate international disputes and result in retaliation against American instrumentalities present in foreign jurisdictions. See id. at 450, 99 S.Ct. 1813. The other consideration is that the "fair apportionment" component of the Complete Auto test cannot be enforced in the international context. See id . at 446, 99 S.Ct. 1813. That test can prevent multiple taxation of instrumentalities in interstate commerce because the Supreme Court can "enforce full apportionment by all potential taxing bodies." Id . at 447, 99 S.Ct. 1813. In the international sphere, however, there is no "authoritative tribunal capable of ensuring that the aggregation of taxes is computed on no more than one full value." Id. at 447-48, 99 S.Ct. 1813. "[N]either [the] Court nor this Nation can insure full apportionment when one of the taxing entities is a foreign sovereign." Id. at 447, 99 S.Ct. 1813 ; see Anthony Colangelo, The Foreign Commerce Clause, 96 Va. L. Rev. 949, 966-69 (2010) (analyzing Japan Line ).
One sentence in Japan Line requires careful analysis. In discussing the need for national uniformity with respect to foreign commerce, the Court said, "Although the Constitution, Art. I, § 8, cl. 3, grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater." Id. at 448, 99 S.Ct. 1813. The government's brief points to this sentence in support of its argument that congressional power under the Foreign Commerce Clause is "plenary." But the sentence must be read in context. The Court did not say that the term commerce has a broader meaning in the foreign-commerce context than it does in the interstate-commerce context. Nor did it say that the term regulate has a broader meaning in the former context. Nor did the Japan Line opinion have occasion to consider congressional power to regulate the conduct of Americans abroad. Indeed, the question was not the extent of congressional power; no one was arguing about whether Congress could pass legislation imposing taxes like those imposed by California, or even authorize states to impose such taxes. Rather, the question was the exclusivity of congressional power: Could California, in the absence of federal regulation, impose its own regulations? The one-voice principle in Foreign Commerce Clause jurisprudence does not expand congressional power. It does not add a megaphone to magnify the voice of Congress and permit it to enact legislation that it would not otherwise be permitted to enact. Rather, it is a restriction on the States. It silences them so that only the voice of the national government is heard on international matters.
*1249 This construction of the meaning of the comment in Japan Line s is consistent with the "evidence" that the Court referred to in its footnote. See id. at 448 n.12, 99 S.Ct. 1813. The footnote cites to Federalist No. 42, which discusses the powers granted the federal government to "regulate the intercourse with foreign nations," such as the powers to make treaties, to send and receive ambassadors, and to regulate foreign commerce. The Federalist No. 42, at 231 (Madison) (E.H. Scott ed., 1898). The essay states: "This class of powers forms an obvious and essential branch of the federal administration. If we are to be one nation in any respect, it clearly ought to be in respect to other nations." Id. This passage is certainly support for the exclusivity of federal authority noted in Japan Line , but it has no relevance to our case.[5]
The Court's footnote also cites a law-review article as "concluding, after an exhaustive survey of contemporary materials: 'Despite the formal parallelism of the grants, there is no tenable reason for believing that anywhere nearly so large a range of action was given over commerce "among the several states" as over that "with foreign nations." ' " 441 U.S. at 448 n.12, 99 S.Ct. 1813 (quoting Abel, supra at 475). Nothing in the article, however, even hints at the possibility that the Foreign Commerce Clause could be used to govern noncommercial conduct of Americans abroad. The quotation from the Abel article is the conclusion of a discussion confirming the accuracy of Madison's recollection of the Convention decades afterwards, in which he "explicitly negatives the suggestion that the [Interstate Commerce Clause] was designed to have as wide an operation as the companion grant with regard to foreign commerce, and assigns to it instead merely 'a negative and preventive' function, to control state-created discriminations and preferences." Abel at 469 (quoting Letter of February 13, 1829, to J. C. Cabell, as quoted in 3 Farrand 478). In other words, Abel was saying that the Framer's view, totally contrary to current doctrine, was that the Interstate Commerce Clause was not considered as a grant of affirmative legislative power to regulate interstate commerce, but as a means to constrain state interference with such commerce. See id. at 468-75; see also id. at 471 ("There is thus not a single occasion in the proceedings of the convention itself where the grant of power over commerce between the states was advanced as the basis for independent affirmative regulation by the federal government. Instead, it was uniformly mentioned as a device for preventing obstructive or partial regulations by the states."). Moreover, the Abel article points out the limited scope that the Founders gave to the term commerce even in the foreign-commerce context: "These three large classes of subjects-fiscal regulation [that is, duties] as to imports and exports, navigation, 'mercantile' enterprises-are the only ones that there is any evidence for believing were thought of by any one as embraced within 'commerce' or affected by the grant of power to regulate it." Abel, supra at 465; see also id. at 464 (emphasizing the narrow notion of mercantile (or merchant) enterprises at the time of the Convention, stating that the merchant's "activities conform *1250 nicely to those of the present-day importer, commission house, and wholesale firm, with just a dash of the commodity exchange; they hardly embrace those of the jobber, the hawker, or the retailer, who to us is the merchant par excellence."). What we now consider to be the scope of the interstate-commerce power surely exceeds the Founders' conception of the foreign-commerce power. See id . at 478 ("Today [that is, 1941] we are accustomed to think of the arteries of commerce, the highways and the inland streams, harbors, bridges, and the like, as within the ambit of congressional power under the commerce clause. This is not the way the framers of the constitution looked at the matter.").[6]
The panel opinion suggests that the text of the Commerce Clause indicates that power under the Foreign Commerce Clause exceeds that under the Interstate Commerce Clause. See Maj. Op. at 1201-02. It notes that the Clause speaks of commerce "with foreign Nations" but "among the several States." But the difference in prepositions indicates the opposite. If the Clause permitted regulation of commerce "among foreign nations"-so that the two clauses used the same preposition-then Congress would be empowered to regulate commerce among France, England, and Italy, even if the United States were not involved at all. Thus, use of the preposition with instead of the preposition among obviously limits the extent of the Foreign Commerce Clause. See Colangelo supra at 970-71 (explaining the difference between the uses of the two prepositions in the Commerce Clause).[7]
In short, the greater-power statement by the Supreme Court in Japan Line should not be overread. The statement was made in the context of the assertion that the need for national uniformity under the Foreign Commerce Clause could require greater limitations on state action than would the Interstate Commerce Clause alone. As Justice Thomas has observed:
This Court's statements about the comparative breadth of the Foreign Commerce Clause are of questionable relevance where the issue is Congress' power to regulate, or even criminalize, conduct within another nation's sovereign territory. ... [E]ven if the foreign commerce power were broader than the interstate commerce power as understood at the founding, it would not follow that the foreign commerce power is broader than the interstate commerce power as this Court now construes it.
Baston v. United States , --- U.S. ----, 137 S.Ct. 850, 852, 197 L.Ed.2d 478 (2017) (Thomas, J., dissenting from denial of certiorari).
This is not to say that national powers under the Foreign Commerce Clause and the Interstate Commerce Clause must be identical. After all, Japan Line makes clear that they are not. When it comes to state taxation of commerce, there are "plain intelligible cause[s]," Gibbons , 22 U.S. at 194, why States must be more limited in taxing foreign commerce than in taxing interstate commerce. For one thing, there is the need for the nation to speak with one voice in relations with other countries. That "cause," however, has no purchase in this case. The statutory provision under which Defendant was convicted was hardly animated by any perceived need to *1251 prevent the various States from engaging in conflicting policies toward foreign nations.
The panel opinion also suggests that some interstate-commerce doctrine-in particular, the gloss presented in Lopez and Morrison - does not apply because the limits on interstate-commerce power in that doctrine reflect concerns for the sovereignty of the States, concerns not present in foreign-commerce doctrine. But surely there is no reason to define the terms commerce and regulate more broadly in the foreign-commerce context than in the interstate-commerce context. And the majority's approach overlooks a key principle underlying Lopez and Morrison : The Court's concern was not just that an overbroad conception of the interstate-commerce clause would give the federal government authority that could override police powers held by the States; it also expressed a fundamental concern that an overbroad conception would give the federal government general police powers, contrary to the constitutional framework of a federal government of limited power. See, e.g. , Lopez , 514 U.S. at 564, 115 S.Ct. 1624 ("if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate"); id. at 566, 115 S.Ct. 1624 ("The Constitution ... withhold[s] from Congress a plenary police power that would authorize enactment of every type of legislation."); id . at 567, 115 S.Ct. 1624 ("To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States."); see also Nat'l Fed'n of Indep. Bus. , 567 U.S. 519, 535-36, 132 S.Ct. 2566, 183 L.Ed.2d 450 (Roberts, C.J., writing separately) ("This case concerns two powers that the Constitution does grant the Federal Government, but which must be read carefully to avoid creating a general federal authority akin to the police power.").
The real danger lies in overbroad application of the third type of regulation under the Commerce Clause: the regulation of activities that substantially affect commerce. Given the reality that in modern times every activity can be said to have some effect on commerce, courts must set reasonable limits on the meaning of "substantial effect" or concede that the vision of a Constitution of limited powers, see, e.g. , U.S. Const. amend. X, is a mirage and anything can be justified under the Commerce Clause. The power under the Foreign Commerce Clause is one of the limited powers granted to Congress by the Constitution. Courts should not construe it in a way that would amount to ceding to Congress a general police power over Americans with respect to all conduct beyond our shores.
Unlike the Supreme Court doctrine that the Foreign Commerce Clause embodies the concept that the country should speak with one voice in foreign affairs, which is firmly supported by evidence from the Founding, there is nothing-at least nothing brought to my attention or that I have found-suggesting that the Framers held any idea remotely like the possibility that the Foreign Commerce Clause would provide plenary power to police the behavior of Americans in foreign countries. Rather, the evidence is to the contrary. As Chief Justice Marshall explained:
The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of *1252 that sovereignty to the same extent in that power which could impose such restriction.
All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source.
The Schooner Exch. v. McFaddon , 11 U.S. (7 Cranch 116) 136, 3 L.Ed. 287 (1812) (emphasis added). And specifically with respect to trade, Alexander Hamilton wrote the following a few years after ratification of the Constitution:
Congress ... may regulate by law our own Trade and that which foreigners come to carry on with us, but they [that is, Congress] cannot regulate the Trade which we may go to carry on in foreign countries, they can give to us no rights, no privileges there. This must depend on the will and regulation of those countries; and consequently it is the province of the power of Treaty to establish the rule of commercial intercourse between foreign nations and the U[nited] States. The Legislature may regulate our own Trade but Treaty only can regulate the mutual Trade between our own and another Country.
Alexander Hamilton, The Defence No. XXXVI (Jan. 2, 1796), in 20 The Papers of Alexander Hamilton (Harold C. Syrett ed. 1974), available at http://founders.archives.gov/documents/Hamilton/01-20-02-0002[8] ; see Al-Maliki , 787 F.3d at 793 ("[A]n unbounded reading of the Foreign Commerce Clause allows the federal government to intrude on the sovereignty of other nations-just as a broad reading of the Interstate Commerce Clause allows it to intrude on the sovereignty of the States."), cert. denied , --- U.S. ----, 136 S.Ct. 204, 193 L.Ed.2d 158 (2015).
These views of the exclusivity of sovereign jurisdiction are overstated, at least under current international law. I recognize that international law now generally permits a nation "to prescribe law with respect to ... the activities, interests, status, or relations of its nationals outside as well as within its territory." Restatement (Third) of the Foreign Relations Law of the United States § 402 (1986) ; see United States v. Mitchell , 553 F.2d 996, 1001 (5th Cir. 1977). But see Restatement (Third) § 403(1) ("a state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable"); Colangelo supra at 1035-37. But that is beside the point that is relevant here. This proposition of international law does not distinguish the Foreign Commerce Clause from the Interstate Commerce Clause. International law would permit the federal government to enact the statutes struck down in Lopez and Morrison . The question is what our Constitution permits. And the *1253 statements by Chief Justice Marshall and Alexander Hamilton, together with the absence of any evidence that the Foreign Commerce Clause was conceived as providing congressional authority to govern all (or any?) conduct in foreign nations, strongly suggest that the sovereignty of foreign governments was as much assumed with respect to the Foreign Commerce Clause as was state sovereignty with respect to the Interstate Commerce Clause. (It should also be noted that in one respect the sovereignty of foreign nations was entitled to greater consideration-namely, the States, by ratifying the Constitution, had voluntarily ceded some of their sovereignty to the federal government.)
Indeed, Japan Line based its limitations on state power imposed by the Foreign Commerce Clause in part on the recognition of the limits of the federal government's power in other countries. When foreign commerce is taxed by the States, the Supreme Court cannot prevent multiple taxation by requiring apportionment of the taxes by the sovereignties imposing them, as the Court can when only interstate commerce is involved, because the Court has no authority over foreign governments. See 441 U.S. at 447-48, 99 S.Ct. 1813. And for the same reason, the federal government cannot prevent foreign nations from retaliating when the States impose such taxes. See id. at 450, 99 S.Ct. 1813. Federal power under the Foreign Commerce Clause should be construed with consideration of the sovereign power of other nations just as federal power under the Interstate Commerce Clause is constrained by state sovereignty. See Al-Maliki , 787 F.3d at 793 ; Anthony J. Colangelo, The Foreign Commerce Clause , 96 Va. L. Rev. 949, 971-83 (2010) (identifying the "Foreign Sovereignty Concern" as a limit on congressional power under the Foreign Commerce Clause).
Further, the Tenth Amendment-"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"-emphasizes that exceeding power under the Foreign Commerce Clause infringes on the rights of the people. See Al-Maliki , 787 F.3d at 793 ("[A]n overbroad interpretation of the Foreign Commerce Clause allows the government to intrude on the liberty of individual citizens. And that seems at least as wrong as a reading of the Commerce Clause that allows the government to intrude on the States. See U.S. Const. amend. X (reserving power to the States 'or to the people.' ") ).
I should emphasize that the point I am making is a limited one. I am not saying that the Constitution forbids the exercise of any power over conduct in other nations. For one thing, constitutional provisions other than the Foreign Commerce Clause can be the source of such power. And my view does not totally foreclose the exercise of such power under the Foreign Commerce Clause, even as authority for other provisions of the PROTECT Act. For example, what I am saying does not call into question the constitutionality of the prohibition on travel to a foreign country with the intent to engage in illicit sexual conduct (the charge Defendant was acquitted of) or the prohibition on engaging in commercial illicit sexual conduct after travel to a foreign country. I am merely rejecting the notion that because the Foreign Commerce Clause overrides state sovereignty, the power under the Clause to regulate conduct in foreign nations is unconstrained.
To summarize, absent some "plain, intelligible cause"-such as the need for the nation to speak with one voice in foreign affairs or the limits of national power in a foreign country-I shall assume that the *1254 language "to regulate commerce" has the same meaning in the Foreign Commerce Clause as in the Interstate Commerce Clause. In particular, I borrow jurisprudence regarding the Interstate Commerce Clause in two respects. First, since the power of Congress under both that clause and the Foreign Commerce Clause is "[t]o regulate Commerce," I can adopt the Interstate Commerce Clause doctrine interpreting that language to encompass three types of regulation: regulation of the channels of commerce, regulation of the instrumentalities of commerce, and regulation of activities that substantially affect commerce. See Gonzales , 545 U.S. at 16, 125 S.Ct. 2195 ("Cases ... have identified three general categories of regulation in which Congress is authorized to engage under its commerce power"); United States v. Clark , 435 F.3d 1100, 1118 (9th Cir. 2006) (Ferguson, J., dissenting) ("A fairer understanding of the tri-category framework is that it has evolved not only in response to federalism concerns that courts have read into Congress's Interstate Commerce power, but also to give content to what it means generally '[t]o regulate Commerce,' art. I, § 8, cl. 3." (brackets in original) ). Other courts and judges have done the same when evaluating congressional enactments under the Foreign Commerce Clause. See Bollinger , 798 F.3d at 215 ("We agree that the Lopez categories provide a useful starting point in defining Congress's powers under the Foreign Commerce Clause."); Pendleton , 658 F.3d at 308 (analyzing constitutionality of PROTECT Act provision under " Lopez 's 'time-tested' [Interstate Commerce Clause] framework" since the "Supreme Court has not yet held that Congress has greater authority to regulate activity outside the United States than it does within its borders"); Clark , 435 F.3d at 1118 (Ferguson, J., dissenting) (criticizing majority for departing from Interstate Commerce Clause framework in resolving issue under Foreign Commerce Clause); United States v. Reed , No. CR 15-188, 2017 WL 3208458, at *7 (D.D.C. July 27, 2017) ("Given the ambiguous contours of this constitutional power and the dearth of precedent in this jurisdiction, this court will look-as others have done-to the well-known Interstate Commerce Clause framework to analyze whether Section 2423(c) is a constitutional exercise of Congress' Commerce Power."); cf. United States v. Baston , 818 F.3d 651, 668 (11th Cir. 2016), cert. denied , --- U.S. ----, 137 S.Ct. 850, 197 L.Ed.2d 478 (2017) (upholding statute on assumption "that the Foreign Commerce Clause has the same scope as the Interstate Commerce Clause"); United States v. Bredimus , 352 F.3d 200, 204-08 (5th Cir. 2003) (analyzing 18 U.S.C. § 2423(b) foreign-commerce issue under framework of interstate-commerce case law, but stating that under Japan Line greater deference is owed to regulation of foreign commerce); United States v. Homaune , 898 F.Supp.2d 153, 159 (D.D.C. 2012) (upholding statute on assumption that the "Foreign Commerce Clause is at least as broad as the more familiar Interstate Commerce Clause," citing Japan Line ).
Second, I adopt the limiting principle employed by the Court in the interstate-commerce context that the power conferred by the Clause cannot be construed so broadly as to encompass everything that can somehow be causally connected to commerce. Such a construction would be contrary to any notion of the Constitution as the source of only enumerated powers. See Morrison , 529 U.S. at 615-19, 120 S.Ct. 1740 ; Lopez , 514 U.S. at 566, 115 S.Ct. 1624 ("The Constitution ... withhold[s] from Congress a plenary police power"); see also Nat'l Fed'n of Indep. Bus. v. Sebelius , 567 U.S. 519, 554, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (separate opinion of Roberts, C.J.) ("[O]ur cases have 'always recognized that the power to *1255 regulate commerce, though broad indeed, has limits.' " (quoting Maryland v. Wirtz , 392 U.S. 183, 196, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) ) ); id. at 536, 132 S.Ct. 2566 (Congress's power over commerce "must be read carefully to avoid creating a general federal authority akin to the police power."). In the contemporary world, where everything can be said to be connected in some way to international commerce, the risk of using the Foreign Commerce Clause to justify plenary police powers (not just at home, but abroad as well) is every bit as great as the risk of using the Interstate Commerce Clause for the same purpose. Thus, when I turn to congressional power under the Foreign Commerce Clause to enact the third category of regulation-regulation of activities that substantially affect commerce-I will keep in mind the Supreme Court's conception of "substantially" to preclude regulation of activities whose connection to commerce is too indirect.
III. Application of Foreign Commerce Clause to This Case
I now proceed to consider whether § 2423(c), as applied to noncommercial illicit sexual conduct, can be justified under the Foreign Commerce Clause as one of the three types of permissible regulation.
A. Channels of Commerce
As discussed at length earlier in this opinion, the Commerce Clause grants Congress the authority "to keep the channels of interstate commerce free from immoral and injurious uses." Caminetti , 242 U.S. at 491, 37 S.Ct. 192 ; see Perez , 402 U.S. at 150, 91 S.Ct. 1357 ("The Commerce Clause reaches ... the use of channels of interstate or foreign commerce which Congress deems are being misused ." (emphasis added) ). Under this authority the Supreme Court has affirmed bans on interstate transportation of women who are to be put to immoral purposes, Caminetti , 242 U.S. at 483, 37 S.Ct. 192 ; wives for the purpose of polygamy, see Cleveland , 329 U.S. at 18, 67 S.Ct. 13 ; kidnapped persons, see Perez , 402 U.S. at 150, 91 S.Ct. 1357 ; stolen property, see id. ; or lottery tickets, see Lottery Case , 188 U.S. at 354-55, 23 S.Ct. 321. In these cases the person or thing barred from interstate commerce was tainted by either prior immoral conduct or the intent to engage in such conduct upon completion of the journey.
That channels authority does not extend to the conduct for which Defendant was convicted. I can assume that it extends to the conduct for which the jury found Defendant not guilty-traveling in [foreign commerce] with the intent to commit illicit sexual conduct. But absent that intent, Defendant could not be distinguished from any ordinary international traveler. The channels of foreign commerce were free of immoral and injurious uses since his intent was not found to be corrupt. He was not tainted at the time of travel. Cf. Patton , 451 F.3d at 621 n.3 ("[T]he statute [in Caminetti ] does not criminalize the transportation of persons who happen, after crossing state lines, to become prostitutes."); Clark , 435 F.3d at 1120 (Ferguson, J., dissenting) ("The mere act of boarding an international flight, without more, is insufficient to bring all of [a person's] downstream activities ... within the ambit of Congress's Foreign Commerce power.").
The government nevertheless suggests that this court is bound to hold that the statutory provision before us constitutes channels regulation because of our conclusion in United States v. Hinckley, 550 F.3d 926, that the Sex Offender Registration and Notification Act (SORNA) can be upheld as regulation of the channels of commerce. The rationale for SORNA is that convicted sex offenders pose a particular danger to the public, the public needs to *1256 be warned of their proximity, and they should not be permitted to misuse the channels of interstate commerce to move from the state of conviction to another state to avoid this publicity. Under SORNA, sex offenders are not absolutely prohibited from interstate travel, but they can do so only if they register promptly upon establishing a new residence.
SORNA is a comfortable fit as channels regulation. The person subject to regulation is a person who can be identified while in the channels of commerce-the person has been convicted of a sexual offense. Such persons can be considered tainted things traveling in the channels of interstate commerce. And the SORNA registration requirement is an incidental condition for permitting such persons to travel in those channels. See United States v. Anderson , 771 F.3d 1064, 1070 (8th Cir. 2014) ("[T]he registration requirements of [SORNA] are part of the constitutional power Congress has to punish sex offenders who cross state lines. Because Congress has the power to punish sex offenders across state lines, Congress is able to exercise the 'narrow' and 'incidental' power of requiring those sex offenders to register." (citation omitted) ). That is a very different situation from the statutory provision here, because the defendant traveling to a foreign country cannot be singled out for any prior misconduct or even any intent to commit misconduct in the future. Hinckley does not control this case.
The government has not offered any principled basis, or any basis for that matter, for upholding channels-of-commerce authority for Defendant's offense that would not permit Congress to subject an American to federal prosecution for any offense committed abroad. Congress could penalize an American who traveled abroad and committed fraud, gambled (even if lawful where conducted), or merely littered. The federal government would have plenary police power over all Americans anywhere in the world. This cannot be the product of a Constitution of limited powers. I respectfully disagree with the Third Circuit's reliance on the above-cited channel-of-commerce cases to sustain a similar conviction. See Pendleton , 658 F.3d at 311.
B. Instrumentalities of Commerce and Persons or Things in Commerce
Lopez held that "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." 514 U.S. at 558, 115 S.Ct. 1624. No court has affirmed the PROTECT Act on this ground. The government, however, argues that Defendant was a person "in [foreign] commerce" and therefore subject to congressional regulation. But this argument is based on a misconception of what it means to be "in interstate [or foreign] commerce." What Lopez was speaking of was regulation governing persons or things while they are traveling. A law prohibiting robbing people riding on an interstate stagecoach or thefts of property from trains would be within this power. See Patton , 451 F.3d at 622 (suggesting that a proper statute under the Commerce Clause could "protect [an item] while it is moving in interstate shipment"). Our precedent notes that "[t]he illustrative cases for this category involve things actually being moved in interstate commerce, not all people and things that have ever moved across state lines." Id . Section 2433(c) is obviously not protecting Defendant while he is moving in foreign commerce, or protecting the instrumentalities of foreign commerce that he is using. See id .
Although we stated in passing in Hinckley , 550 F.3d at 940, that SORNA would be constitutional under this category of regulation *1257 of interstate commerce, we did not distinguish the category as applied in that context from the first category of regulation-regulation of the channels of commerce. And I have already explained how SORNA differs from § 2423(c) under the first category, so Hinckley is distinguishable on that score. I am reluctant to read the passing reference in Hinckley as a rejection of the more thorough analysis provided by Patton of the second category of regulation. Cf. Auraria Student Hous. v. Campus Vill. Apartments , 843 F.3d 1225, 1235 (10th Cir. 2016) (earlier circuit precedent ordinarily prevails over later decision).
C. Substantial Effects on Commerce
The final source of congressional authority over commerce is the power to regulate "activities that substantially affect interstate [or foreign] commerce." Lopez , 514 U.S. at 559, 115 S.Ct. 1624. In analyzing this issue, it is first necessary to recognize that noncommercial sexual activity is not commerce . It is not "the buying, selling, production, or transportation of products or services, or any activity preparatory to it." Patton , 451 F.3d at 624-25. It is not even economic activity, which "refers to the production, distribution, and consumption of commodities." Raich , 545 U.S. at 25, 125 S.Ct. 2195 (internal quotation marks omitted); see Patton at 625 ("[I]n Raich , the [Supreme] Court interpreted the contours of the third category by reference to 'economics' rather than 'commerce,' and included the 'consumption of commodities' as well as their production and distribution within that definition."). Engaging in noncommercial nonconsensual sexual activity is no more an economic activity than the gender-motivated violence targeted by the statute held unconstitutional in Morrison . See 529 U.S. at 613, 120 S.Ct. 1740 ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity.").
The fact that noncommercial nonconsensual sexual activity is not economic activity is extremely important, probably dispositive, in determining whether it is subject to the third category of regulation of commerce. The Supreme Court thus far has upheld under the third category only regulation of economic activity. See Raich , 545 U.S. at 17, 125 S.Ct. 2195 ("Our case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce.") The panel opinion cites Raich as a case in which the Court "upheld congressional regulation of noncommercial activity." Maj. Op. at 1214-15 n.21. But the Supreme Court opinion made clear that the activity, even if not commercial, was "economic." It distinguished earlier Court decisions overturning congressional legislation with the words: "Unlike those at issue in Lopez and Morrison , the activities regulated by the [Controlled Substances Act] are quintessentially economic ." Raich , 545 U.S. at 25, 125 S.Ct. 2195 (emphasis added).
To be sure, the term illicit sexual conduct in § 2423 does include economic, even commercial, activity. But the broad statutory definition of the term cannot change the nature of every activity within the definition. Suppose the Controlled Substances Act also prohibited jogging (because it can produce a runner's high ). That would not place jogging within the "economic class of activities" of controlled substances and thereby allow the prohibition. Cf. Sebelius , 567 U.S. at 547-61, 132 S.Ct. 2566 (Opinion of Roberts, C.J.) (failure to purchase medical insurance is not economic activity and cannot be regulated under the Commerce Clause despite effect on health-insurance market); id . at 646-48, 132 S.Ct. 2566 (Scalia, J., joined by three other Justices in concurring on this issue) ("failure to engage in economic activity *1258 (the purchase of health insurance) is [not] subject to regulation under the Commerce Clause").
But even if noncommercial illicit sexual conduct could be regulated if it has a substantial effect on commerce, there is no reason to believe that it has such an effect. As noted earlier, the Supreme Court has examined three factors in conducting a substantial-effect analysis: the relation of the regulated activity to commerce; congressional findings about the activity's effects on commerce; and the presence in the statute of an express jurisdictional element limiting the reach of the statute. See Morrison , 529 U.S. at 611-13, 120 S.Ct. 1740. I now consider those factors.
1. Relation of Activity to Commerce
Noncommercial activity can affect commerce. The Supreme Court has recognized, for example, that if the activity involves a good that is identical to (fungible with) goods in commerce, regulation may be permissible. (Do not forget, though, that activity with respect to goods is "economic" activity. See Raich , 545 U.S. at 25, 125 S.Ct. 2195.) In Wickard , Congress had authorized quotas on the production of wheat because the industry had been plagued by large surpluses that depressed prices. See 317 U.S. at 113, 125-28, 63 S.Ct. 82. A farmer who grew wheat in excess of the quota (to feed poultry and livestock on his farm, to use in making flour for home consumption, and for seeding the following year) challenged the quota, arguing that it regulated noncommercial conduct. See id. at 114, 118, 63 S.Ct. 82. But the Court upheld the quota as a permissible regulation to protect the price of a commodity because the aggregate effect of many farmers exceeding the quota would substantially affect the wheat market. See id. at 127-28, 63 S.Ct. 82. It reasoned that farmers who grow wheat in excess of the quota purely for home consumption are doing so instead of buying wheat on the market, thereby decreasing the demand for wheat and undermining Congress's goal of boosting the price. See id. at 128-29, 63 S.Ct. 82. "Home-grown wheat in this sense competes with wheat in commerce." Id. at 128, 63 S.Ct. 82. Congress therefore had the authority to regulate wheat grown "wholly for consumption on the farm" to protect the price of the commodity in commerce. Id. at 118, 63 S.Ct. 82.
Six decades later, the Supreme Court addressed a challenge to the federal ban on marijuana in the Controlled Substances Act (CSA). The CSA, said the Court, "regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market." Raich , 545 U.S. at 26, 125 S.Ct. 2195. In particular, Congress had classified marijuana as a drug with a high potential for abuse and no accepted medical use, which made its manufacture, distribution, or possession a criminal offense. See id. at 14, 125 S.Ct. 2195. The question was whether those prohibitions could encompass "the intrastate, noncommercial cultivation and possession of cannabis for personal medical purposes as recommended by a patient's physician pursuant to a valid California state law." Id. at 8, 125 S.Ct. 2195 (internal quotation marks omitted). The Court answered the question affirmatively because Congress "had a rational basis for concluding that leaving home-consumed marijuana outside federal control would ... affect price and market conditions." Id. at 19, 125 S.Ct. 2195. Just like wheat grown for home consumption, marijuana cultivated for that purpose overhangs the market, making it likely that "high demand in the interstate market will draw such marijuana into the market." Id.
Relying on Wickard and Raich , the government argues that the PROTECT Act is within congressional power because it was *1259 enacted "to close the child-sex-tourism market." Aplee. Br. at 62. That rationale may well suffice with respect to the provision of the Act barring commercial sex. But the analogy to Wickard and Raich fails when it comes to the provision of the Act under which Defendant was convicted. The regulated activities in Wickard and Raich may not have been commerce, but they were economic. Defendant's illicit sexual conduct, in contrast, was not. To advance regulatory authority from commerce to economic activity is one thing. The step from economic activity to noneconomic activity may be a step too far. See Morrison , 529 U.S. at 611, 120 S.Ct. 1740 ("[I]n those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor."); id. at 613, 120 S.Ct. 1740 ("While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."). At the least, when the regulation of noneconomic activity is justified under the Commerce Clause on the ground that it substantially affects commerce, that justification cannot be based on "pil[ing] inference upon inference" in a way that threatens to make the Clause a source of a general police power. Lopez, 514 U.S. at 567, 115 S.Ct. 1624. Tenuous connections are not "substantial." And one must keep firmly in mind that the Court has yet to find a substantial effect on commerce arising from noneconomic activity. See Morrison , 529 U.S. at 611, 613, 120 S.Ct. 1740.
In any event, the government has not offered any reason to believe that control of noneconomic sex abuse will affect the market in commercial sex trafficking. When dealing with fungible commodities the connection is clear. See Raich , 545 U.S. at 19, 125 S.Ct. 2195 ("In both cases, the regulation is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity.") But here there is no apparent connection. If data show that prosecutions of noncommercial child sexual abuse reduce the incidence of commercial abuse, those data have not been presented to this court. I cannot agree with the unexplained view of the Fourth Circuit that "[i]t is eminently rational to believe that prohibiting the noncommercial sexual abuse of children by Americans abroad has a demonstrable effect on sex tourism and the commercial sex industry." Bollinger , 798 F.3d at 218. Contra United States v. Bianchi , 386 F. App'x 156, 163 (3d Cir. 2010) (Roth, J., dissenting) ("I find that there is no rational basis to conclude that an illicit sex act with a minor undertaken on foreign soil, perhaps years after legal travel and devoid of any exchange of value, substantially affects foreign commerce."); Reed , 2017 WL 3208458, at *12-13 (the connection is "too attenuated to rationally qualify as 'substantial.' "); United States v. Park , 297 F.Supp.3d 170, 178-79 (D.D.C. 2018) (following Reed ).
In upholding the regulations in Wickard and Raich , the Supreme Court was dealing with fungible commodities. See Raich , 545 U.S. at 26, 125 S.Ct. 2195 ("Prohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." (emphasis added) ); id . at 18, 125 S.Ct. 2195 ("Like the farmer in Wickard , respondents are cultivating, for home consumption, a fungible commodity for which there is an established, albeit illegal, interstate market." (emphasis added) ). Home-grown wheat is essentially indistinguishable from wheat *1260 produced for commerce, and home-grown marijuana for medical purposes is essentially the same product as commercial marijuana. A "customer" could not distinguish the two products when eating or smoking them. Here, in contrast, the government has not suggested that sex tourists who prey on children are indifferent to whether their victims are provided by commercial enterprises or they must seek out their victims at places like mission schools and assault the children on their own.
Nor is it enough simply to point to the substantial effect on commerce of a great deal of activity regulated by a statute and then justify regulation of additional activity that is pasted into the statute on the ground that it is "part of a larger regulation of economic activity." Maj. Op. at 1208, 1211 (internal quotation marks omitted). The fully stated proposition is that conduct that otherwise could not be regulated can be regulated if it is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated ." Lopez, 514 U.S. at 561, 115 S.Ct. 1624 (emphasis added). Accord Raich , 545 U.S. at 24-25, 125 S.Ct. 2195. For example, the Court in Wickard "had no difficulty concluding that Congress had a rational basis for believing that, when viewed in the aggregate, leaving home-consumed wheat outside the regulatory scheme would have a substantial influence on price and market conditions." Raich , 545 U.S. at 19, 125 S.Ct. 2195. The conclusion is common sense, even obvious. In addition, the record in that case "made it clear that the aggregate production of wheat for [noncommercial] use on farms had a significant impact on market prices." Id. at 20, 125 S.Ct. 2195. Likewise in Raich there were findings by Congress that in effect "established the causal connection between the production [of marijuana] for local use and the national market." Id. As the Court said, "that the ... exemptions [sought by the respondents] will have a significant impact on both the supply and demand sides of the market for marijuana ... is readily apparent." Id . at 30, 125 S.Ct. 2195 ; see id. at 22, 125 S.Ct. 2195 ("[W]e have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA ." (emphasis added) ).
Translating that precedent to the case before us, regulation of the conduct at issue here is proper only if such regulation is "an essential part" of the regulation of commercial sex tourism because failure to control noncommercial illicit sexual conduct would "undercut" that regulation. Yet neither the government brief nor the panel opinion explains how this is the case. When products are fungible, the connection is commonsensical. But the tie between commercial sex with children and noncommercial nonconsensual sexual assault is a mystery. Nor is the mystery resolved by any findings by Congress, the subject to which I now turn.
2. Congressional Findings
Congressional findings about the effects of the prohibited activity on commerce can inform the analysis. See Lopez , 514 U.S. at 562, 115 S.Ct. 1624. But they are not dispositive. For example, in Morrison the Court ruled that the statute providing a civil remedy to victims of gender-motivated violence was unconstitutional despite "numerous findings regarding the serious impact that gender-motivated violence has on victims and their families." 529 U.S. at 614, 120 S.Ct. 1740. Those findings, however, relied on the types of attenuated effects between violence and commerce-violence deters victims from traveling interstate and engaging in interstate businesses, diminishes national productivity, increases *1261 medical and other costs, and decreases both supply of and demand for interstate products-that the Court had previously rejected as insubstantial because recognizing such tenuous effects would eliminate limits on congressional power. See id. at 615, 120 S.Ct. 1740 ("Congress' findings are substantially weakened by the fact that they rely so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers.").
The panel opinion discusses at length the long history of federal legislation governing interstate and international travel for sex offenses. The great bulk of that history is irrelevant because it does not speak to the specific regulation at issue here. See Lopez , 514 U.S. at 563, 115 S.Ct. 1624 ("[I]mportation of previous [legislative] findings to justify [the challenged statutory provision] is especially inappropriate here because the prior federal enactments or Congressional findings do not speak to the subject matter of [the provision] or its relationship to interstate commerce." (original brackets and internal quotation marks omitted) ). Moreover, Congress made no findings when adopting the PROTECT Act. Congress did do so, however, in debating its failed precursor, the Sex Tourism Prohibition Improvement Act of 2002 (STPIA). And I will assume that a court can consider those findings in evaluating the constitutionality of the PROTECT Act. When considering STPIA, the House Judiciary Committee reported the following:
Many developing countries have fallen prey to the serious problem of international sex tourism. According to the National Center for Missing and Exploited Children, child-sex tourism is a major component of the worldwide sexual exploitation of children and is increasing. There are more than 100 web sites devoted to promoting teenage commercial sex in Asia alone. Because poor countries are often under economic pressure to develop tourism, those governments often turn a blind eye toward this devastating problem because of the income it produces. Children around the world have become trapped and exploited by the sex tourism industry.
There would be no need for a sex tourism statute if foreign countries successfully prosecuted U.S. citizens or resident aliens for the child sex crimes committed within their borders. However, for reasons ranging from ineffective law enforcement, lack of resources, corruption, and generally immature legal systems, sex tourists often escape prosecution in the host countries. It is in those instances that the United States has an interest in pursuing criminal charges in the United States.
The Justice Department, Federal law enforcement agencies, the State Department and other U.S. entities expend significant resources assisting foreign countries most afflicted with sex tourism to improve their domestic response to such criminal offenses. Our assistance encompasses informal as well as formal training of foreign law enforcement officers and prosecutors in the investigation and prosecution of sex tourism crimes. By and large these countries reach out to the United States for help and some even blame the United States for the problem, "arguing" that many of the sex tourists are American. Some of the foreign or "host" countries experiencing significant problems with sex tourism, such as Nicaragua, Costa Rica, Thailand and the Philippines, have requested that the United States act to deal with this growing problem.
Current law requires the Government to prove that the defendant traveled to a foreign country with the intent to engage in sex with a minor. H.R. 4477 eliminates the intent requirement where *1262 the defendant completes the travel and actually engages in the illicit sexual activity with a minor. The bill also criminalizes the actions of sex tour operators by prohibiting persons from arranging, inducing, procuring, or facilitating the travel of a person knowing that such a person is traveling in interstate or foreign commerce for the purpose of engaging in illicit sexual conduct with a minor. This legislation will close significant loopholes in the law that persons who travel to foreign countries seeking sex with children are currently using to their advantage in order to avoid prosecution.
H.R. Rep. 107-525, at 2-3 (2002).
What is notably missing from these findings is any statement, much less evidence, regarding the impact of noncommercial illicit sexual activity by international travelers on commercial illicit sexual activity. While the above findings may support the constitutionality of a ban on commercial sex acts with children in foreign countries, they say nothing about the effects on foreign commerce of noncommercial nonconsensual molestation of children abroad. There were no findings that noncommercial offenses affect the child-sex market, or even that Congress cannot adequately control commercial offenses unless it also prohibits noncommercial offenses. It is as if when Congress enacted § 2423(c) to eliminate the requirement that a defendant travel in interstate commerce with the intent to engage in illicit sexual conduct , it was so focused on those who engage in commercial illicit sexual conduct that it overlooked the impact of the change on the prohibition of noncommercial illicit sexual conduct.
In its congressional-findings argument the government also relies on the Optional Protocol to the Convention on the Rights of the Child regarding the Sale of Children, Child Prostitution and Child Pornography, stating that "[t]he PROTECT Act was ... passed as part of the United States' obligation under the Optional Protocol." Aplee. Br. at 60. The government apparently seeks to impute the reasons that the United States ratified that treaty to Congress's decision to enact the PROTECT Act. (It does not argue that any part of the PROTECT Act was enacted under the authority of the Constitution's Treaty Clause, U.S. Const. art. II, § 2, cl. 2.) I question whether one should consider the Optional Protocol in this context because Congress never mentioned it in the texts or legislative histories of the PROTECT Act or STPIA. But even if one were to do so, the government's reliance would be misplaced. The Optional Protocol covers only commercial sex offenses against children; it says nothing about the effects of noncommercial sex offenses on foreign commerce. See Reed , 2017 WL 3208458, at *16 ("The Optional Protocol calls on States Parties to create and enforce laws that prohibit the exploitation of children for commercial gain ." (emphasis added) ).
Thus, the congressional findings "do not speak to the subject matter of [the provision under which Defendant was convicted] or its relationship to [foreign] commerce." Lopez, 514 U.S. at 563, 115 S.Ct. 1624 (brackets and internal quotation marks omitted). This is not an inconsequential matter. Although congressional findings are not necessary to support commerce-clause legislation, they can be significant, "particularly when the connection to commerce is not self-evident." Raich, 545 U.S. at 21, 125 S.Ct. 2195. Here, the connection is not self-evident. Without congressional findings, I cannot see how prevention of noncommercial sexual assault on children would substantially affect commercially provided sex abuse. See Lopez, 514 U.S at 563, 115 S.Ct. 1624 ("[T]o the extent that congressional findings would enable us to evaluate the legislative judgment that the *1263 activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here.")
3. Express Jurisdictional Element
There remains the one factor that could support congressional power to punish Defendant's offense under the substantial-effects rationale: "travel[ing] in foreign commerce or resid[ing], either temporarily or permanently, in a foreign country" is an express element of 18 U.S.C. § 2423(c). See United States v. Jeronimo-Bautista , 425 F.3d 1266, 1269 (10th Cir. 2005) (asking "whether the statute's reach was limited by an express jurisdictional element"). "A jurisdictional hook is not, however, a talisman that wards off constitutional challenges." Patton , 451 F.3d at 632. What the Supreme Court has said is that "a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce." Morrison , 529 U.S. at 612, 120 S.Ct. 1740 (emphasis added). As we stated in Patton , "The ultimate inquiry is whether the prohibited activity has a substantial effect on interstate [or foreign] commerce, and the presence of a jurisdictional hook, though certainly helpful, is neither necessary nor sufficient." 451 F.3d at 632. Our opinion, see id. , endorsed similar views expressed by other circuits: United States v. Maxwell , 446 F.3d 1210, 1218 (11th Cir. 2006) ("[W]here a jurisdictional element is required, a meaningful one, rather than a pretextual incantation evoking the phantasm of commerce, must be offered." (brackets, citation, and internal quotation marks omitted) ); United States v. Holston , 343 F.3d 83, 88 (2d Cir. 2003) (expressing unwillingness to rely solely on "the mere existence of jurisdictional language purporting to tie criminal conduct to interstate commerce"); United States v. Rodia , 194 F.3d 465, 472-73 (3d Cir. 1999) (rejecting a "hard and fast rule that the presence of a jurisdictional element automatically ensures the constitutionality of a statute").
In my view, the jurisdictional hook here does not do the trick. I have already expressed why I believe that the government has not shown any connection between noncommercial illicit sexual conduct committed by Americans who traveled abroad and commercial illicit sexual conduct (the only type of "commerce" that it would allegedly affect). More important are the ramifications of relying on this jurisdictional hook. I do not see, nor has the government provided, a principled way to distinguish the use of this hook to justify the statutory provisions under which Defendant was convicted from the use of an identical hook that would permit Congress to prohibit any misconduct by Americans abroad, from gambling (even if lawful in the country where conducted) to jaywalking. All that would be needed is to add the hook that the defendant had traveled in foreign commerce. At the least there should be evidence or a congressional finding, not just speculation, of a direct, not "attenuated," effect on commercial activity. Morrison , 529 U.S. at 615, 120 S.Ct. 1740.
True, Patton recognized the tension between the analysis of the Interstate Commerce Clause in Lopez and Morrison and the Supreme Court's decision in Scarborough v. United States , 431 U.S. 563, 565, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977), "which held that Congress intended a felon-in-possession statute to prohibit possession of any firearm that had moved in interstate commerce," Patton, 451 F.3d at 634. Scarborough implicitly accepted that such a prohibition was constitutional. See id. Feeling bound by Scarborough , this court upheld the constitutionality of a statute that prohibited "the intrastate possession by a felon of a bulletproof vest, in the absence of any commercial transaction or *1264 any evidence of a connection to commercial activity other than the fact that, before it was lawfully purchased by the defendant, the vest had been sold across a state line," even though the prohibition could not be justified under the Supreme Court's "three-part test for determining the reach of the Commerce Clause." Id. at 618-19.
But Scarborough cannot be extended so far as to encompass the statute before us. The jurisdictional hook in Scarborough was interstate travel by a commodity, not by a person, and certainly not by a person like Defendant-who had not engaged in any activity before or during the travel that would distinguish him or her from any other person. If Scarborough stands for the proposition that the Interstate Commerce Clause authorizes Congress to prohibit any activity occurring after personal travel in interstate commerce, then it provides a general police power to the federal government that would erase the "distinction between what is truly national and what is truly local." Lopez , 514 U.S. at 567-68, 115 S.Ct. 1624. I am confident that such a result was not the teaching of Scarborough .
To sum up, there can be little question that a statutory provision otherwise identical to the one on which Defendant was convicted could not pass muster under the Interstate Commerce Clause if travel in interstate commerce were substituted for travel in foreign commerce. He did not engage in economic activity, and there is no reason to believe that activity like his has a substantial effect on commerce. Nor can the provision be upheld under the Foreign Commerce Clause merely on the unfocused proposition that congressional power under that clause is greater than the power provided by the Interstate Commerce Clause. To uphold the provision, the Foreign Commerce Clause would need to be interpreted to confer congressional power to regulate all conduct of Americans while abroad. Nothing suggests that the Framers had any such concept of the Clause; on the contrary, the evidence suggests that such power would seem most strange to them. Moreover, such a power would be wholly inappropriate under a Constitution of conferred, limited power.
I therefore would hold that the statutory provisions under which Defendant was convicted cannot be justified under the Foreign Commerce Clause. At the very least, § 2423(c) is unconstitutional as applied in this case. Not only is it uncontroverted that Defendant was not a sex tourist, he was not even a tourist. The government does not suggest that he had any tie to commercial sex trafficking. The connection between his kind of offense and sex tourism is far too attenuated to support regulation under the Foreign Commerce Clause.
I agree with Judge Ferguson: "The sexual abuse of children abroad is despicable, but we should not, and need not, refashion our Constitution to address it." Clark , 435 F.3d at 1117 (9th Cir. 2006) (Ferguson, J., dissenting); see Reed , 2017 WL 3208458, at *11, *19 (holding § 2423(c) unconstitutional as applied to a defendant who molested his daughter while residing abroad); Park , 297 F.Supp.3d at 178-79 (following Reed ); see also Al-Maliki , 787 F.3d at 792-94 (upholding this portion of the statute on plain-error review, but suggesting that the panel majority would have held it unconstitutional if the issue had been preserved); United States v. Bianchi , 386 F. App'x 156, 163 (3d Cir. 2010) (Roth, J., dissenting) ("I find that there is no rational basis to conclude that an illicit sex act with a minor undertaken on foreign soil, perhaps years after legal travel and devoid of any exchange of value, substantially affects foreign commerce."); cf. Baston , 137 S.Ct. at 850 (Thomas, J., dissenting from denial of petition for certiorari in criminal prosecution *1265 under Foreign Commerce Clause) ("We should grant certiorari and reaffirm that our Federal Government is one of limited and enumerated powers, not the world's lawgiver."); Colangelo supra at 1039-40 (doubting the constitutionality of § 2423(c) with respect to noncommercial sexual abuse of minors).
The Supreme Court has provided little, if any, guidance regarding congressional power under the Foreign Commerce Clause to regulate the conduct of Americans abroad. If the Court believes that it is appropriate to cabin that power, this may be as good a vehicle as any to convey the message.
For the above reasons, I respectfully dissent.

Congress may also have authority over such trafficking under the Treaty Clause, because this country has ratified the Optional Protocol to the Convention on the Rights of the Child regarding the Sale of Children, Child Prostitution and Child Pornography. But the government has not relied on the Treaty Clause in this case and the Optional Protocol addresses only commercial activity.

Subsection (b) states:
Travel with intent to engage in illicit sexual conduct.-A person who travels in interstate commerce or travels into the United States, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.
This subsection replaced a somewhat narrower version in the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796.

Subsection (c) states:
Engaging in illicit sexual conduct in foreign places.-Any United States citizen or alien admitted for permanent residence who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

Subsection (f) states:
Definition.-As used in this section, the term "illicit sexual conduct" means-
(1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States;
(2) any commercial sex act (as defined in section 1591 ) with a person under 18 years of age; or
(3) production of child pornography (as defined in section 256(8) ).

The essay also notes the role played by the Interstate Commerce Clause in facilitating foreign commerce: "[I]t may be added, that without this supplemental provision [the Interstate Commerce Clause], the great and essential power of regulating foreign commerce would have been incomplete and ineffectual. A very material object of this power was the relief of the States which import and export to other States, from the improper contribution levied on them by the latter." The Federalist No. 42 at 235. An 1829 letter from James Madison cited in the Japan Line footnote also states this purpose for the Interstate Commerce Clause. Again, the point being made is the need for exclusive federal power.

The Japan Line footnote also cited two student notes that do not affect the analysis.

I am perplexed by the statement: " 'Among' in the [Interstate Commerce Clause] restrains Congress in regulating intrastate matters-a constraint not present in the [Foreign Commerce Clause]." Maj. Op. at 1202. Since the Foreign Commerce Clause requires that the commerce be that of a foreign country with the United States, it obviously restrains the application of that Clause within a foreign country.

The panel opinion points to an additional passage from earlier in Hamilton's essay: "[A nation's] power to make laws ... acts compulsively upon all persons, whether foreigners or Citizens, and upon all things, within its territory, and it acts in like manner upon its own citizens and their property without its territory in certain cases and under certain limitations. But it can have no obligatory action whatsoever upon a foreign nation or any person or thing within the jurisdiction of such foreign Nation." The Defence . The panel opinion reads this passage as permitting prosecution for acts in another country so long as the prosecution occurs here. See Maj. Op. 1205 n.17. This is not an unreasonable interpretation if the passage is read in isolation, although such a prosecution would seem to contradict the notion expressed by Hamilton that a nation cannot impose obligations on someone (that is, on his or her conduct) while in a foreign jurisdiction. But in any event, any ambiguity in this passage is resolved by the later passage quoted in the above text, which says that Congress "cannot regulate the trade which we may go to carry on in foreign countries." The Defence .